In re AMEX TRADING COMPANY, INC., fka Evergreen Trading Company, Inc. and Evergreen Brokers, Inc., Debtor.

AMEX TRADING COMPANY, INC., fka Evergreen Trading Company, Inc. and Evergreen Brokers, Inc., Plaintiff,

v.

BROWN FEED & CHEMICAL COMPANY, Defendant.

Bankruptcy No. 83–20311.
Adv. No. 83–0525.

United States Bankruptcy Court,
W.D. Tennessee, W.D.

Feb. 22, 1984.

**794**

J. Keith McCormic, and J. Stanley McNeese, Memphis, Tenn., for plaintiff.

John L. Ryder, Memphis, Tenn., for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM B. LEFFLER, Bankruptcy Judge.

This matter arises out of a Complaint for Avoidance of Preferential Transfer and Monetary Judgment filed against the defendant, Brown Feed & Chemical Company (hereinafter 'Brown'), in the Chapter 11 case of Amex Trading Company, Inc., fka Evergreen Trading Company, Inc. and Evergreen Brokers, Inc.,[1] BK No. 83–20311, Adversary No. 83–0526. The complaint seeks to recover $347,594.80 in preferential transfers. The Court in an earlier hearing ruled that the debtor was insolvent during the 90-day period preceding its filing on January 26, 1983. The debtor has proved all of the remaining elements of a preferential transfer under 11 U.S.C. § 547(b) which provides that a trustee (or a debtor-in-possession under § 1107(a) of the Bankruptcy

Code) may avoid any transfer of property of the debtor—

"(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title."

Defenses raised in this cause are based on exceptions to § 547(b) which are found in §§ 547(c)(2), the forty-five days rule and 547(c)(4), the subsequent extension of new value.

The focus of this litigation is on two transfers which the debtor claims are preferential under 11 U.S.C. 547.* The first is a series of four cash payments issued to the defendant on November 10, 1982 and paid by the debtor's bank on November 15, 1982 totalling $150,000. The second is the transfer of a barge of urea fertilizer by the debtor to the defendant valued at $197,-424.60 which was credited to the debtor's account. The actual date of this transfer and the propriety of the defendant showing

---

1. Since the corporation name change to Amex did not occur until December 9, 1982 upon purchase of the corporate assets by Mr. Billy Key, the debtor will hereinafter be referred to by its prior name of Evergreen since the major-

ity of the dealings between the parties took place under that name.

* See Chart attached as Exhibit 1 for graphic display of transactions between the parties.

the shipment as a credit on its books rather than paying for the fertilizer in cash are among the controverted facts in this lawsuit.

The record shows that Evergreen and Brown had an ongoing business relationship spanning several years. The debtor was both a broker and a buyer and seller of agricultural chemicals, as was the defendant. Documents introduced into the record showed transactions dating back to June of 1982 while testimony by Mr. Archie Brown, a partner in the defendant company, traced the dealings between the two companies to at least February of 1981.

Transactions to consider with regard to the first allegedly preferential transfer of the $150,000 in November of 1982 would include the following purchases by the debtor: August 25, chemicals $71; September 14, Paraquat, $138,939.84; September 14, diesel and cash, $153.75; October 16, Treflan due November 10, $135,420; October 21, Lasso and Treflan, $48,408, and October 21, diesel, $103.75. Payments or returns included a payment on October 20 of $224.75; two returns of Paraquat on October 26 of $46,016.40 and $42,750.72 and a payment of $103.75 on November 8.

Subsequent to the payment of the four checks totalling $150,000, the debtor made the following additional purchases: November 19, chemicals, $75,354; November 19, chemicals, $95,256; November 19, chemicals, $65,459.50, and December 2, diesel, $98.50. A credit of $197,524.60 is shown on January 19, 1983 for the urea, purchased by Brown from Evergreen.

Circumstances surrounding the urea purchase, the second allegedly preferential transfer, are fraught with controversy. Undisputed, however, are the facts that the fertilizer was purchased by Evergreen from Bowles & Assoc., Inc. of Alexandria, La., on or about December 22, 1982; that it was sent to Donaldsville, La. where it was shipped by the Transportation Management and Consulting, Inc., on or about January 2, 1983; that it was unloaded by Mt. Vernon Barge Service, Inc. on or about January 19, 1983 in Mt. Vernon, Ind., Brown's point of

destination and that all shipping charges and unloading fees were paid by the defendant. The respective dates of shipment and delivery play a significant part in the resolution of this matter as do the disputed terms of the contract.

Concerning the urea transaction, it is the debtor's contention that the contract called for a payment in cash of $108,000 plus a credit issued to Evergreen of $89,594.80. The defendant alleges that the aforementioned terms were never agreed upon by the parties and that a credit to the debtor's account was the acceptable and appropriate method of payment. According to Evergreen the debt owing by Brown to Evergreen arose on January 19, 1983, the date of delivery of the fertilizer to the defendant. Brown contends that the relevant date is January 2, 1983, the date the urea was shipped.

The Code section germane to the 45-day rule exception provides as follows:

§ 547

"(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms."

■ In viewing whether the $150,000 in payments made in November of 1982 should fall within the 45-day rule exception, it is necessary to determine when the transfer occurred and when the debts arose and whether the transaction were in the ordinary course of business between the parties. The debtor contends that the proper date of the transfer is November 15, 1982, the date the checks were paid by the debtor's bank. Tracing 45 days back from November 15 in

order to calculate previously incurred debts would put the measuring date at October 2, 1982. Forty-five days back from November 10, the date on the checks would make September 27 the starting date. Since the September 14 purchases by the debtor fall outside the 45-days in either case it is not necessary to make a ruling on the issue of whether the transfer date was November 10 or November 15.

Three debts incurred by Evergreen, $135,-420 on October 16 and $48,408 and $103.75 on October 21, totalling $183,931.75, fall within either 45-day period. During the same period the debtor made the three payments of $224.75, $103.75 and $150,000, as well as returning two orders of Paraquat totalling $88,767.12. It is the defendant's position, supported by its credit memos, that the returned items were specifically credited against the September 14 purchase of Paraquat by the debtor and that the $224.75, $103.75 and $150,000 payments therefore relate back only to the two purchases of October 16 and October 21. Subtracting the $88,767.12 credit from the September 14 Paraquat purchase leaves a pre-45-day period balance on either September 27 or October 2 of $50,326.47. Applying the $150,338.50 in preferential payments to the oldest debt first would result in payment of the $50,326.47. Since this balance falls outside the 45-day exception, it would under § 547(c)(2)(B) be a recoverable preferential transfer.

As to whether the transfer was in payment of a debt incurred in the ordinary course of business both parties testified to a history of buying and selling of agricultural chemicals between the two companies, and business records introduced at trial substantiated this position. The debts incurred and the payments and credits made appear to reflect no unusual dealings that would take the transactions out of the exception offered to creditors under § 547(c)(2)(A)(C) or (D).

The legislative history of the 45-day rule is addressed in the case of *Matter of Craig Oil Co.,* 31 B.R. 402, 406 (Bkrtcy.M.D.Ga. 1983) as follows:

"The legislative history of section 547(c)(2) states that the 'purpose of this exception is to leave undisturbed normal financial relations because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors . . .'

S.Rep. No. 989, 95th Cong., 1st Sess. 88, *reprinted* in 1978 U.S.Code Cong. & Ad. News 5787, 5874; H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted* in 1978 U.S.Code Cong. & Ad.News 5963, 6329 (emphasis added by the court.)"

■ While a recoverable preference seems likely under § 547(c)(2), Brown also defends on the grounds that the subsequent new value rule is applicable. 11 U.S.C. § 547(c)(4) which codifies the rule reads as follows:

"(C) The trustee may not avoid under this section a transfer—

(4) To or for the benefit of a creditor to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor."

Following the payment to Brown by the debtor of $150,000, Brown extended unsecured credit to the debtor on November 19 of $75,354, $95,256 and $65,459.50 and on December 2 of $98.50, totalling $236,168 of new value.

The debtor contends that based on the case of *Matter of Bishop,* 17 B.R. 180, 184 (Bkrtcy.N.D.Ga.1982), the defendant's subsequent value argument must fail. *Bishop* held that "[f]or § 547(c)(4) to apply, three requirements must be met. First, the creditor must extend new value as defined in § 547(a)(2) as 'money or . . . new credit' after the challenged payment. . . . . Secondly, the new value must be unsecured. . . . Finally, the new value must go unpaid." It is the last requirement upon

which the debtor relies for following the extension of the $236,168 by Brown, the creditor purchased from Evergreen the barge of urea fertilizer for which it took a $197,524.60 credit.

Interpretation by the courts and the legislative history of § 547(c)(4) is incompatible with the *Bishop* ruling. In the case of *In re Rustia*, 20 B.R. 131, 135 (Bkrtcy.S.D.N.Y.1982) the court interpreted the subsequent value rule as follows:

"... The 'formula in paragraph (4)' is not consistent with defendant's view, which applies the net result rule *to the entire 90 day preference period as a whole.* Under paragraph (4) new value must be given by the creditor 'after such transfer.' Thus, only preferential transfers made by the debtor before the new value was given may be netted out against the subsequent new value. However, preferential payments following receipt of new value are not netted against the new value. Thus, the net result rule does not apply to the 90 day preference period as a whole; each transfer must be examined independently to determine whether or not the creditor later replenished the estate." (Emphasis added by court).

This Court in an earlier preference action brought by the debtor, *Amex Trading Co. v. Grain Services, Inc.,* No. 83–20311, Adv. No. 83–0529, Memorandum Opinion and Order, July 14, 1983, at page 4, relied on the following language from *In re Rustia:* " 'new credit is extended only when the debtors actually use the credit line by making purchases or receiving cash advances, since the value of the item purchased or the cash obtained augment the estate for the purposes of distribution to creditors.' "

In the case of *In re Thomas W. Garland, Inc.,* 19 B.R. 920, 926 (Bkrtcy.E.D.Mo.1982) the debtor-in-possession sought the turnover of payments made to a utility company during the 90 days preceding filing of bankruptcy. Section 547(c)(4) was relied upon by the defendant. The court dealt extensively with the legislative history of the section in order to determine if codification of the net result rule were intended. Deciding that only the principles of the rule were acknowledged by the drafters of the Code, the court noted that "[s]ection 547(c)(4) serves the general goals of the preference provisions of the Code. A creditor is encouraged to cooperate with a financially troubled debtor and is protected to the extent that he extends new credit in reliance on prior payments. Unusual action by either a creditor or a debtor is discouraged." The appropriate formula in section 547(c)(4), according to *Garland* is that "[a] creditor who has received a preferential transfer may retain that transfer to the extent that, *after such transfer,* such creditor gave new value to or for the benefit of the debtor." (Emphasis added by the court.) *Id.*

The later case of *In re Fulghum Const. Corp.,* 706 F.2d 171, 173 (6th Cir.1983) offers even stronger language rejecting codification of the net result rule in the Code:

"Since the net result rule is 'broader' in scope than the subsequent advance rule of § 547(c)(4), engrafting the former doctrine upon § 547(b)(5) as a threshold requirement for the qualifying preference would render the defense incorporated in § 547(c)(4) impotent. The broader scope of the net result rule permits its utilization by the creditor irrespective of whether the value furnished by the creditor to the debtor is advanced either before or after the transfer from the debtor to the creditor. Contrariwise, the subsequent advance rule of § 547(c)(4) is more circumscribed in application and forecloses avoidance of the transfer by the trustee only if the creditor provides additional value after the transfer from the debtor to the creditor. A 'judicial gloss' which significantly restricts the statutory definition of 'preference' and pragmatically emasculates the creditor defense thereto as intended by Congress in § 547(c)(4) constitutes nothing less than legislation by judicial decree."

*Fulghum* goes on to point out that "[s]ection 547(b) deliberately defines a preference as a 'transfer,' rather than as an aggregate

of transfers or netting of transactions between the creditor and debtor, and § 547(c) artfully articulates equitable 'defenses' whereby the trustee may be foreclosed from avoiding the preference." *Id* at 174.

There is no question but that following the $150,000 in payments by Evergreen, Brown allowed the debtor to incur additional debt. Since there was a portion of the debt owing to Brown which fell outside the 45 days, the payment could still be offset by the subsequent advance by the creditor.

According to 4 *Collier on Bankruptcy* ¶ 547.37 at 547–118 (15th ed. 1983): "If the transfer can qualify under any one of the exceptions, it is protected to that extent. If it can qualify under several, it is protected by each to the extent it qualifies." Since the first transfer falls only partially within the exception of § 547(c)(2), it is necessary to invoke § 547(c)(4) to the extent of $50,326.47.

■ With regard to the second transfer, the bargeload of urea fertilizer, the same question of when the debt was incurred, when the transfer was made and whether ordinary business practices prevailed must be addressed. The answers are not as readily deduced as in the first transfer.

First, the parties are in disagreement as to when the urea was transferred from the debtor to the defendant. If the transfer occurred on January 2, 1983, the date the barge was loaded and shipped, then the debtor's obligations which arose between November 19, 1982 and January 2, 1983 could be offset by the fertilizer. The debtor made four purchases during the period totalling $236,168. If the measuring date is January 19, 1983, the date the barge was delivered to Brown, there would have been no debts incurred in the 45 days preceding delivery commencing with December 6, 1983 and therefore no avoidable preference.

This threshold issue is addressed by *Collier* in ¶ 547.38 at 547–121 (15th ed. 1983): "The determination of when a debt is actually 'incurred' is critical. One view is that the debt is not incurred until an invoice is sent or demand for payment is made. One probably better view is that the debt is incurred whenever the debtor obtains a property interest in the consideration exchanged giving rise to the debt. Thus if goods are identified for shipment, unless the special agreement otherwise provides, the debtor has a special property interest and the debt is 'incurred.' "

The court in the *Matter of Richter & Phillips Jewelers & Distributors, Inc.*, 31 B.R. 512 (Bkrtcy.S.D.Ohio 1983), chose the date goods were identified to the contract and shipped as the date the debt arose rather than the last day for payment under the terms of the contract. This Court also has selected shipment as the measuring date in an earlier proceeding wherein this debtor sought to set aside a preferential transfer, *Amex Trading Co. v. Donald McShan*, No. 83–20311, Adv. No. 83–0533, Memorandum Opinion and Order, July 12, 1983. Pertinent language at page 11 of the decision states that:

"All recent decisions have found that the debtor obtains a property interest in the goods and thus the debt is incurred under § 547(c)(2) when the goods are shipped. See *In the Matter of Advance Glove Manufacturing* Co., 25 B.R. 521 (B.Ct.E.D.Mich.1982); *In re Caro Products*, 23 B.R. 245 (B.Ct.E.D.Mich.1982); *In re Iowa Premium Service Co.*, Inc., 676 F.2d 1220 (8th Cir.1982); *In re Valles Mechanical Industries, Inc.*, 20 B.R. 350, 9 B.C.D. 334 (B.Ct.N.D.Ga.1982); *In re Gulf States Marine, Inc.*, 6 B.C.D. 79 (B.Ct.W. D.La.1980)."

Finally it is helpful to look at Tennessee law in determining how to calculate the appropriate measuring dates: T.C.A. § 47–2–501 offers the following guidance to the Court:

"(1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence

of explicit agreement identification occurs:

(b) if the contract is for the sale of future goods other than those described in paragraph (c), when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers;"

In the earlier *McShan* decision, this Court relied upon commentary by Richard B. Levin, a member of the House Judiciary Committee staff which drafted the Code, who stated that " 'For the purpose of this exception, the debt is incurred when it becomes a legally binding obligation on the debtor. Thus when goods are shipped, the debtor becomes liable for the payment, and the debt is incurred.' Levin, An Introduction to the Trustee's Avoiding Powers, 53 Am. Bankr.L.J. 173 (1979)." *Amex v. McShan, supra.* p. 10.

■ Notwithstanding testimony by Mr. Key that he could have at any time turned the barge around once it left Donaldsville, La., this Court is satisfied that the case law supports the conclusion that the goods were identified to the defendant and it became liable for the debt on January 2, 1983, the date of shipment. Thus on that date the second transfer by the debtor was made, which was later formalized as a credit by the defendant to the debtor's account. It is fair and equitable to use the date of shipment as the date the creditor herein became indebted to the debtor, thus giving rise to the credit which is the subject of the second preferential transfer, since the debtor in the earlier action chose shipment as the measuring date in order to defeat a preference exception.

The final issue to be addressed with regard to the second transfer is whether the debt was incurred in the ordinary course of the business of both parties, whether the transfer was made in the ordinary course of business and whether the payment was made according to ordinary business terms.

The debtor strongly asserts that it was never its intention to allow the urea to be applied as a credit on its account with Brown. Mr. Key testified that at the time

of the transaction Evergreen had a zero cash flow and that the bargeload of fertilizer was the corporation's only asset. He said that he never would have transferred the urea without an agreement whereby the debtor would receive product or cash to alleviate its financial problems. Archie Brown testifying for the defendant, categorically denied that there had ever been such an agreement.

According to T.C.A. § 47–1–205 a course of dealing is "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as · establishing a common basis of understanding for interpreting their expressions and other conduct."

In the *Craig* case, *supra,* the trustee sought to avoid as preferential payments cashier's checks transferred from the debtor to the creditor. Proof showed that the debtor had previously been paying with corporate checks and that the creditor, aware of the precarious financial position of the debtor, demanded assurances before continuing to supply its product to the debtor. In finding a preference the court noted that the creditor was treated differently by the debtor to discourage the creditor from joining with another creditor so as to force the debtor into an involuntary bankruptcy. In *Craig* it was clear that the course of dealings between the parties had changed and that the payment by cashier check was not in the ordinary course of business between the parties.

In the instant case the debtor, in addition to its assertion of insolvency at the time of the transfer, contends that payment by credit rather than cash was not in the ordinary course of business between it and Brown. Mr. Key testified that in the course of his experience with the debtor he knew of only one instance with a creditor other than Brown where the debtor had transferred barges of product for credit on account.

The creditor, on the other hand, said it was a normal part of its business relationship with the debtor for the debtor to ship

its product and for Brown to apply the product to the debtor's account. The creditor was able to produce for examination three invoices dated April 23, 1982, June 14, 1982 and June 16, 1982 where the debtor's account had been credited with product purchased by Brown from Evergreen. Mr. Brown did testify that payment was ordinarily made by cash but that in a minority of the cases payment did take place through the crediting of accounts. He indicated that this use of credit took place reciprocally between the debtor and creditor and between the creditor and other dealers.

Mr. Key, in substantiating his interpretation of the contract, pointed to invoice dated January 16, 1983 from Evergreen to Brown which included the following language:

> "TERMS: Cash—$108,000.00 January 16, 1983 plus credit issued to Evergreen Trading in amount of $89,594.80. Credited Amount to be adjusted to actual measured unloaded tonnage on delivery."

Also introduced by the creditor was an invoice dated January 5, 1983 from Evergreen to Brown for the same net tonnage of urea with the terms "payable upon delivery." It is the creditor's position that giving the debtor a credit against its outstanding balance was an acceptable method of payment and that the first invoice controls. Archie Brown testified as follows: "Many times whenever we bought chemicals from them, if they had a balance with us, which they usually did, we would just write up an invoice showing a chemical return and then crediting their account for the amount that we purchased from them." TR 48. Across the January 5, 1983 invoice is handwritten notation "Credited 1–19–83 Inv. 3643 M B.2"

The debtor contended that negotiations regarding terms of the contract in which he was personally involved were in progress up to delivery of the product to Brown. He related circumstances surrounding a meet-

ing held with Mike Brown in Carmel, Illinois on January 12, 1983. At that time the debtor alleges that the parties agreed that the barge of fertilizer would be traded for a barge of Treflan. Prior to a subsequent trip to Carmel on January 16, the debtor testified that the defendant had agreed to the part-product, part-cash arrangement. However, upon Mr. Key's arrival at the defendant's office, Archie Brown allegedly told him that they had decided they weren't going through with the deal.

The debtor emphasized that its cash flow problems dictated the terms of the sale and that because of its circumstances, crediting rather than paying in cash was outside ordinary business practices between the parties. However, there is nothing in the record to show that the defendant was aware of the debtor's dire financial straits. On the contrary, there was evidence introduced indicating that on or about the time of the $150,000 in payments by the debtor to the defendant, Michael Brown, as president of Brown's Feed and Chemical, wrote an endorsement letter for Evergreen for use by the debtor in obtaining additional credit elsewhere. Dated November 9, 1982 and written on the defendant's stationery the letter read as follows:

> "Please be advised that Brown's Feed and Chemical has been dealing with Evergreen Trading Company for three years. During this time Evergreen has had a high credit balance of $600,000. Current balance is less than $50,000. Normal credit terms are net thirty days unless by special agreement, which have varied from ten days to ninety days.

> "My past credit experience with Evergreen Trading Company has been very satisfactory. I think E. Robert Gates, owner of Evergreen Trading Company, is aware of the importance of reputation and performance and will make every effort to live up to his commitments."

According to *In re Bagwell*, 29 B.R. 457, 460 (Bkrtcy.D.Ore.1983) the purpose of sec-

---

**2.** "M B" refers to Michael Brown, son of Archie Brown, and the other partner in the defendant company.

tion 547(c)(4) is to promote extensions of credit to financially shaky debtors. With this in mind it certainly would seem inappropriate to construe a transaction in a manner detrimental to the creditor under circumstances where the financial health of the debtor was not even in question.

Therefore the Court finds that the second transfer of $197,524.60 was made on January 2, 1983 and was preceded within 45 days by $236,168 of antecedent debt incurred under ordinary business conditions and made according to ordinary business terms. However, since $50,326.47 of the $236,168 in new value extended to the debtor following the first transfer of $150,338.50 was used to offset the balance of the first preferential transfer which did not qualify under the 45-day rule, there remains of the $236,168 only $185,841.53 in new debt in the second 45-day period to be used to offset the $197,-524.60 second transfer. Consequently, the balance of $11,683.07 can be recovered by the debtor as a preferential payment.[3]

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED that the plaintiff, Amex Trading Company, Inc., as debtor-or-in-possession, is hereby granted a judgment in the amount of $11,683.07 against the defendant.

EXHIBIT I

TRANSACTIONS BETWEEN

AMEX TRADING COMPANY, INC. (EVERGREEN) and BROWN FEED & CHEMICAL COMPANY

| Pre 45-Days | MEASURING DATE September 27, 1982 and/or October 2, 1982 | 1st 45-day Period | MEASURING DATE November 10, 1982 and/or November 15, 1982 | | MEASURING DATE November 19, 1982 / 2d 45-day Period | MEASURING DATE January 2, 1983 |
|---|---|---|---|---|---|---|
| $50,326.47 | | $183,931.75 | $150,338.50 | | $236,168.00 * | $197,524.60 |
| Balance after crediting two Paraquat returns made during 1st 45-day period. | | Debtor's purchases: $135,420.00 10/16 $ 48,408.00 10/21 $ 103.75 10/21 | First Transfer (Cash payments) | | Debtor's Purchases $75,354.00 $95,256.00 $65,459.50 $ 98.50 | Second Transfer Credit (Bargeload of Urea fertilizer) |

\* For purposes of § 547(c)(4) the $236,168.00 is the extension of new credit under the Subsequent Value Rule.

**1st Transfer**

$50,326.47 in avoidable preferences under § 547(c)(2) can be offset under the Subsequent Value Rule of § 547(c)(4) by the $236,168.00 in new credit extended after the first transfer of $150,338.50.

**2nd Transfer**

$185,841.53, the remaining balance of new debt upon subtraction of the first preference payment of $50,326.47 from the $236,168.00 in new credit, can be applied against the second transfer of $197,524.60, leaving an avoidable preference to be recovered of $11,683.07.

---

3. See *Garland, supra,* 19 B.R. at 929 wherein the court held that "[e]ach dollar of the preferential payment may be set off against each dollar of new value, but the setoff may not be greater than dollar for dollar."