**In re PRODUCTION STEEL, INC., Debtor.**

**PRODUCTION STEEL, INC., Plaintiff,**

**v.**

**SUMITOMO CORPORATION OF AMERICA, Defendant.**

Bankruptcy No. 382–01255.

Adv. No. 384–0151.

United States Bankruptcy Court, M.D.S. Tennessee.

Oct. 23, 1985.

Margaret M. Huff, Chambers, Wyckoff & Beckner, Nashville, Tenn., for plaintiff.

David M. Smythe, King, Ballow & Little, Nashville, Tenn., Howard Joseph, Chicago, Ill., for defendant.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

The debtor-in-possession seeks to recover a preference in the sum of $95,754.65 from Sumitomo Corporation of America. The parties have filed cross-motions for partial summary judgment on the question whether the § 547(c)(2) defense is available to Sumitomo. Production Steel is entitled to summary judgment, dismissing Sumitomo's defense.

The following constitute findings of fact and conclusions of law. Bankruptcy Rule

7052. This is a core proceeding. 28 U.S.C. § 157(b)(2)(F).

## FACTS

The facts are as follows:

July 1, 1981: Production Steel submitted to Sumitomo its purchase order No. 2231 for 440,000 pounds of "Hot Rolled Steel Coil, Pickled & Oiled ASTM A–569–72." The purchase order called for payment 30 days after final delivery F.O.B. loaded truck Nashville, TN. Affidavit of Paul S. Kimura, p. 5, ["Kimura Affidavit"] and Exhibit 15 thereto. The purchase order specified August shipment from Japan. *Id.*

September 9, 1981: Production Steel obtained a $100,000 irrevocable letter of credit from Third National Bank in Nashville guaranteeing payment for purchase order No. 2231. Kimura Affidavit, *supra* at 5 and Exhibit 16 thereto. There is no evidence that letters of credit had been required in any prior transaction between the parties. *See* Kimura Affidavit, *supra* at 1–5 and Exhibits 1–14 thereto. In late 1981, Sumitomo tightened credit terms with Production Steel to include requiring a letter of credit prior to the rolling to steel to Production Steel's specifications. Sumitomo was aware of Production Steel's deteriorating financial condition. Affidavit of S.T. Wright, p. 2–3 ["Wright Affidavit"]. There were numerous discussions between the parties regarding the reduction of Production Steel's indebtedness and Production Steel disclosed its internal financial statements to Sumitomo. *Id.*

September 24, 1981: Production Steel issued its purchase order No. 2360 to the defendant specifying an additional 551,150 pounds of "Hot Rolled Steel Coil, Pickled & Oiled ASTM A–569–72." The terms of this purchase order were the same as those for purchase order No. 2231, with the exception of a slightly higher price and a later delivery date. Kimura Affidavit, *supra* at 5–6 and Exhibit 17 thereto.

October 8, 1981: Production Steel issued its order to revise purchase order No. 2231: it revised the price downward; it revised the delivery term from F.O.B. loaded truck Nashville to F.O.B. loaded truck New Orleans; and it revised the payment terms from 30 days after final delivery to 30 days. Wright Affidavit, *supra* at 1–2 and Exhibit A–1 thereto.

October 13, 1981: Sumitomo, by letter, acknowledged the purchase order change. Wright Affidavit, *supra* at 2 and Exhibit A–2 thereto.

October 26, 1981: By letter, Production Steel cancelled purchase order No. 2360 and amended purchase order No. 2231 to include the steel formerly designated by purchase order No. 2360. Kimura Affidavit, *supra* at 6 and Exhibit 18 thereto.

November 4, 1981: Defendant demanded and received from Production Steel its check in the amount of $35,032.97 as a partial advance payment under purchase order No. 2231. Kimura Affidavit, *supra* at 6.

November 11, 1981: Sumitomo contracted with its affiliate Sumitomo Shoji Kaisha, Ltd. ["Sumitomo Japan"] for the steel products specified by Production Steel to be manufactured by Nippon Steel Corporation and shipped to Sumitomo, C.I.F. New Orleans, duty unpaid. The sales contract listed the time of shipment as December, 1981, and the port of destination as Nashville via New Orleans. Kimura Affidavit, *supra* at 6 and Exhibit 19 thereto.

December 12, 1981: Nippon Steel Corporation inspected the steel intended for Production Steel. Exhibit A–4 to Wright Affidavit, *supra.*

December 18, 1981: The steel was shipped from Japan to Sumitomo at New Orleans. Affidavit of William Okamoto, 1–2 ["Okamoto Affidavit"].

January 29, 1982: The steel arrived at New Orleans.

February 2, 1982: Sumitomo instructed its customs broker in New Orleans to arrange for barge transportation to Nashville and unloading from barges to trucks at Nashville for delivery to Production Steel's plant. Okamoto Affidavit, *supra* at 2 and Exhibit 3 thereto.

February 8, 1982: The barge company hired by defendant's customs broker issued its straight bill of lading evidencing receipt of the steel from the ocean vessel and shipment to Production Steel in care of the Herbert Marine Terminal in Nashville. Okamoto Affidavit, *supra* at 2 and Exhibit 4 thereto.

February 23—March 2, 1982: The steel was received at Herbert Marine Terminal in Nashville and loaded on trucks for delivery to Production Steel's plant. Okamoto Affidavit, *supra* at 2–3 and Exhibit 5 thereto.

March 1, 1982: Sumitomo issued its invoice No. 13–2–9365 in the amount of $130,787.62 for steel ordered pursuant to purchase order No. 2231. Exhibit 21 to Kimura Affidavit.

March 17, 1982: Sumitomo, by letter, instructed Production Steel to pay $95,-754.65, the balance of invoice No. 13–2–9365 after credit for the $35,032.97 down payment, so that Sumitomo would not be obliged to draw on the letter of credit. Kimura Affidavit, *supra* at 7 and Exhibit 22.

March 25, 1982: Sumitomo received Production Steel's check for $95,754.65, post-dated to April 1, 1982. Kimura Affidavit, *supra* at 7.

March 31, 1982: Sumitomo deposited Production Steel's check. *Id.*

April 1, 1982: The check cleared Production Steel's bank. *Id.*

April 22, 1982: Production Steel filed a Chapter 11 petition.

## I.

At issue on these cross-motions is whether the § 547(c)(2) defense is available to Sumitomo.

Subsection (c)(2) provides:

(c) The trustee may not avoid under this section a transfer—

. . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (1983).[1]

■ Sumitomo has the burden to prove each element of the defense by a preponderance of the evidence. *Richter & Phillips Jewelers & Distributors, Inc. v. Dolly Toy Company*, 31 B.R. 512, 515 (Bankr.S. D.Ohio 1983). There are no material disputed facts.

■ The threshold question is when was the "debt incurred" for purposes of the § 547(c)(2) defense.[2] There is widespread

---

1. Section 462(c) of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353 (BAFJA) eliminated § 547(c)(2)(B) and redesignated §§ 547(c)(2)(C) and (D) as §§ 547(c)(2)(B) and (C) respectively. This Amendment is effective to cases filed after October 7, 1984. BAFJA, § 553. It does not apply to this case. The discussion of the 45-day rule in Part I of this opinion will quickly become of little precedential value.

2. "Debt" is defined by the Code as "liability on a claim." 11 U.S.C. § 101(11). Claim is further defined at 11 U.S.C. § 101(4) as follows:
    (4) "claim" means—
    (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
    (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment,

authority that a debt is incurred under § 547(c)(2)(B) when the debtor first became legally bound. *E.g., Sandoz v. Fred Wilson Drilling Co. (In re Emerald Oil Co.)*, 695 F.2d 833, 837 (5th Cir.1983); *In re Iowa Premium Service Co., Inc.*, 695 F.2d 1109, 1111 (8th Cir.1982) (*en banc*); *Barash v. Public Finance Corp.*, 658 F.2d 504, 510 (7th Cir.1981). This general proposition has been described as a mere "shibboleth ... unobjectionable, but [it] adds nothing." Herbert, "The Trustee Versus the Trade Creditor: A Critique of Section 547(c)(1), (2) & (4) of the Bankruptcy Code," 17 U.RICH. L.REV. 667, 681 (Summer 1983) ["Herbert"]. Herbert appropriately notes that in most sales transactions there are several events which may trigger an obligation. "The real issue is *which* obligation triggers the running of the 547(c)(2) time period." *Id.* (emphasis in original).

Sumitomo argues that the debt was incurred either on the date of its invoice to Production Steel or the date of delivery of the documents of title in Nashville. Either of these dates is within 45 days of the alleged preference. Production Steel maintains that its debt was incurred either on the date the goods were shipped or identified for shipment in Japan, or on the date that the goods arrived in New Orleans. Either of these dates is outside the 45-day period.

This court has previously rejected the argument that the date of a creditor's invoice determines the date of incurring debt for preference purposes. *McLemore v. Ash McNeil Welding Co. (In re Holder & Northern Lumber Co., Inc.)*, 37 B.R. 265, 266 (Bankr.M.D.Tenn.1983). Sumitomo's

arguments do not persuade us to reconsider that holding.

Ordinarily, an obligation is not created by delivery of an invoice. An invoice is merely a "detailed statement of the nature, quantity and cost or price of the things invoiced." *Dows v. National Exchange Bank of Milwaukee*, 91 U.S. 618, 630, 1 Otto 618, 23 L.Ed. 214, 218 (1875). It "is not a bill of sale, nor is it evidence of a sale." *Id.* In *Dows*, the Supreme Court rejected the contention that delivery of an invoice, without more, was sufficient to pass a property interest. The Court stated that transmission of the invoices "is of no significance by itself." *Id.* Rejection of the creditor-controlled invoice date as the benchmark for § 547(c)(2) purposes is consistent with the Congressional scheme underlying § 547. *Holder & Northern Lumber*, 37 B.R. at 266; *accord, Emerald Oil*, 695 F.2d at 837; *Trauner v. Stephenson Associates, Inc. (In re Valles Mechanical Industries, Inc.)*, 20 B.R. 350, 352–53, 9 BANKR.CT.DEC. (CRR) 334, 335, 6 COLLIER BANKR. CAS.2d (MB) 859, 861 (Bankr.N.D.Ga.1982). *See also* 4 L. KING, COLLIER ON BANKRUPTCY ¶ 547.38 (15th ed. 1979) ["COLLIER"] quoted in *Valles*, 20 B.R. at 352–53, 9 BANKR.CT. DEC. (CRR) at 335, 6 COLLIER BANKR. CAS.2d at 861; Herbert, *supra* at 688.

Production Steel cites substantial authority in support of the position that its debt was incurred either on December 12, 1981, the date Nippon Steel inspected the goods, or December 18, 1981, the date the steel was shipped from Japan. Either of these actions worked to identify the goods to the contract under the Uniform Commercial Code. TENN.CODE ANN. § 47–2–501(1)(b) (1979).[3] Production Steel reasons

---

fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. The parties have argued state law to determine when a "right to payment" arises to trigger the creation of a debt. *See Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *Tate v. National Acceptance Co. of America (In re Leeds Homes, Inc.)*, 332 F.2d 648 (6th Cir.), *cert. denied*, 379 U.S. 836, 85 S.Ct. 71, 13 L.Ed.2d 43 (1964).

**3.** Section 2–501 of the Uniform Commercial Code provides that:

(1) The buyer obtains a *special property and an insurable interest in goods* by identification of existing goods as goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs:

. . . .

that identification of the goods created a property interest in Production Steel upon which it was obligated to pay Sumitomo. *See Richter*, 31 B.R. at 515; *Grogan v. Chesebrough-Ponds, Inc. (In re Advance Glove Mfg. Co.)*, 25 B.R. 521, 524, 9 BANKR.CT.DEC. (CRR) 1395, 1396 (Bankr.E.D.Mich.1982); *Weill v. Southern Credit Union (In re Bowen)*, 3 B.R. 617, 619, 6 BANKR.CT.DEC. (CRR) 254, 255, 1 COLLIER BANKR.CAS.2d (MB) 1090, 1092 (Bankr.E.D.Tenn.1980) (quoting Levin, "An Introduction to the Trustee's Avoiding Powers," 53 AM.BANKR.L.J. 173, 187 (Spring 1979) ["Levin"] ). *See also*, 4 COLLIER, *supra* at ¶ 547.38.

Although Production Steel's argument seems to follow from § 2–501, the special property and insurable interest given to the buyer by U.C.C. § 2–501 is very limited. *See* comments 1, 4 to official text. *See also* TENN.CODE ANN. § 47–2–502 (1979) (Buyer's right to goods on seller's insolvency) and TENN.CODE ANN. § 47–2–401(2)(b) (1979) ("[I]f the contract requires delivery at destination title passes on tender there"). This "insurable interest" is separate and distinct from the duty to pay which arises upon delivery and acceptance (unless the contract provides otherwise). *Compare* TENN.CODE ANN. § 47–2–501 (1979) (Insurable interest in goods) *with* TENN.CODE ANN. § 47–2–507 (1979) (Effect of seller's tender). Though it is often true that shipment or identification of the goods gives rise to a claim for payment, it is because the ordinary case does not involve a delivery contract. *See Richter*, 31 B.R. at 512 (shipment); *Advance Glove*, 25 B.R. at 521, 9 BANKR.CT.DEC. (CRR) at 1395 (shipment); TENN.CODE ANN. § 47–2–503, comment 5 to Official Text (1979) ("Under this Article [Chapter] the

"shipment" contract is regarded as the normal one and the "destination" contract as the variant type."). None of the decisions and commentaries cited by Production Steel considers the effect of an F.O.B. place of destination term on the commencement of the 45-day period.

An F.O.B. place of destination term "is a delivery term" which requires the seller to transport goods at his expense and risk and to tender delivery by putting and holding them at the buyer's disposition, giving the buyer any notification reasonably necessary to enable him to take delivery. TENN.CODE ANN. §§ 47–2–319(1)(b) and 47–2–503 (1979). A buyer's duty to pay for goods is conditional on tender of delivery by the seller. TENN.CODE ANN. § 47–2–507(1) (1979). Tender of delivery entitles the seller to payment. *Id.* Herein the contract contained an F.O.B. place of destination term.

Applying ordinary U.C.C. principles, Production Steel did not become obligated to pay the contract price until Sumitomo tendered delivery. TENN.CODE ANN. § 47–2–507(1) (1979); *Hertzberg v. H. Hirschfield & Sons, Inc. (In re Caro Products)*, 23 B.R. 245, 250, 7 COLLIER BANKR. CAS.2d (MB) 316, 322 (Bankr.E.D.Mich. 1983) ("Tender of delivery makes it incumbent upon the buyer ... to accept the goods. Once Caro accepted the goods, the duty to pay the contract price arose."). *See also* TENN.CODE ANN. § 47–2–709 (1979) (Action for the price). The reasonable expectations of the parties to this transaction would be that a right to payment arose upon delivery in accordance with the terms of the U.C.C. and the contract. It is not obvious that a different result should obtain for purposes of § 547(c)(2)(B).[4]

---

(b) if the contract is for the sale of future goods other than those described in paragraph (c), when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers.

TENN.CODE ANN. § 47–2–501(1)(b) (1979) (emphasis added).

**4.** Refusing to apply a general rule of shipment or identification of goods to the contract is

consistent with the policies underlying § 547(c)(2). The legislative history provides that:

The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

Having determined that Production Steel's debt to Sumitomo was incurred upon delivery, we must factually identify the delivery date. The steel arrived in New Orleans from Japan on January 29, 1982. On February 2, 1982 the defendant arranged barge transportation from New Orleans to Nashville and on February 8, 1982 a bill of lading issued for shipment from New Orleans to Production Steel's plant in Nashville. On or between February 23 and March 2, 1982, the steel was loaded on trucks and bills of lading were issued to Production Steel in Nashville.

Delivery under the U.C.C. means a voluntary transfer of possession. TENN.CODE ANN. § 47–1–201(14) (1979). Delivery may be accomplished in any manner permitted by the U.C.C. or agreed upon by the parties. TENN.CODE ANN. § 47–2–503 (1979). Tender of delivery requires the seller to put and hold conforming goods at the buyer's disposition. *Id.*

As of October 1981, the parties had altered their agreement to provide for delivery F.O.B. New Orleans. However, Sumitomo arranged shipment from New Orleans

to Nashville and bills of lading were not tendered to Production Steel until the steel was in Nashville between February 23—March 2, 1982. Whether delivery of the goods and bills of lading in Nashville was the result of an agreement of the parties amending the delivery terms subsequent to the October, 1981 purchase order change, or was a breach of Sumitomo's obligation of perfect performance waived by Production Steel is not addressed in the record. It is clear that no delivery or tender of delivery was accomplished in New Orleans. Accordingly, delivery occurred in Nashville from February 23—March 2, 1982. Production Steel's debt was incurred at that time, within the 45-day period.

## II.

Having established that the transfer occurred within the protected period, Sumitomo still has the burden to prove the remaining elements of its § 547(c)(2) defense.[5]

The terms used in §§ 547(c)(2)(C) and (D) are not defined by the Code.[6] *In re Thom-*

H.R.REP. NO. 595, 95th Cong., 1st Sess. 373 (1977), *reprinted in* 1978 U.S. 5787, 6329. At least for purposes of determining when a debt is incurred between the buyer and seller of goods, slavish application of a shipment or identification benchmark would often be contrary to the expectations of the parties. This is not to say that the date of shipment or identification would never be the appropriate moment when the debt was incurred for § 547(c)(2) purposes. In fact, each transaction between buyers and sellers of goods must be examined to determine when, pursuant to the contract, the course of dealings and applicable commercial law the debt arose. It may be that the authors of COLLIER foresaw this approach. COLLIER states:
> One probably better view is that the debt is incurred whenever the debtor obtains a property interest in the consideration exchanged giving rise to the debt. Thus if goods are identified for shipment, *unless the special agreement otherwise provides,* the debtor has a special property interest and the debt is 'incurred.'

COLLIER, *supra* at ¶ 547.38 (emphasis added). The emphasized language recognizes that the agreement between the parties may provide that a debt is incurred on a date other than shipment. This accords with the treatment of delivery contracts by the U.C.C. and the general principle that terms of the U.C.C. may be varied

by agreement. TENN.CODE ANN. § 47–1–102(3) (1979). Although Levin has proposed a general rule in favor of shipment, he did not discuss the effect of an F.O.B. term. Levin, *supra* at 173. *In re Amex Trading Co., Inc.,* 37 B.R. 793 (Bankr.W.D.Tenn.1984) is distinguishable. In that case Judge Leffler rejected a delivery argument by noting that the debtor had chosen to use the date of shipment as the measuring date in a previous preference action. *Id.* at 799. Nothing in the *Amex* opinion indicates that the parties were dealing with a delivery contract.

5. Chief Judge Paine of this court noted in *Ray v. Gulf Oil Products (In re Blanton Smith Corp.),* 37 B.R. 303, 306, 10 COLLIER BANKR.CAS.2d (MB) 299, 303 (Bankr.M.D.Tenn.1984), that the language of § 547(c)(2) is written in the conjunctive. There is no dispute that § 547(c)(2)(A) has been satisfied by Sumitomo.

6. The exception provided in § 547(c)(2) has no corollary in the former Bankruptcy Act. Under the Act, many ordinary course transfers were not avoidable because the trustee was required to prove that the transferee had knowledge of the debtor's insolvency. Under the Code, a trustee or a debtor-in-possession may avoid a preference regardless of the transferee's awareness of

*as W. Garland, Inc.*, 39 B.R. 412, 415 (Bankr.E.D.Mo.1984). Subsections (C) and (D) test the transaction to determine whether as a whole, it was in the ordinary course of business or financial affairs. Subsection (C) provides a subjective test: Was the transfer ordinary as between the debtor and the creditor? *See Ledford v. Sears, Roebuck & Co. (In re Williams)*, 5 B.R. 706, 6 BANKR.CT.DEC. (CRR) 930, 2 COLLIER BANKR.CAS.2d (MB) 1216 (Bankr.S.D.Ohio 1980) (where a debtor voluntarily and without pressure sharply increased its monthly payments for goods bought on credit, the payments were not in the ordinary course of dealings between the parties). Subsection (D) provides an objective test: Was the transaction made according to ordinary business terms? *Flatau v. Marathon Oil Co. (In re Craig Oil)*, 31 B.R. (Bankr.M.D.Ga.1983) (where a debtor, to assure its good faith and to prevent an involuntary petition, changed form of payment to cashiers checks, the payments were not pursuant to ordinary business terms).

■ Sumitomo has failed to meet its burden of satisfying the subjective test of § 547(c)(2)(C). The evidence, much of which was offered by Sumitomo, demonstrates that the transaction at issue was not made in the ordinary course of business or financial affairs between Production Steel and Sumitomo Corporation.

To be subjectively "ordinary" as between the parties implies some consistency with other business transactions between the debtor and the creditor. Here we have been made aware of the terms of three prior transactions. These three earlier sales are similar to each other but importantly different from the instant transaction. With knowledge of Production Steel's deteriorating financial condition, Sumitomo imposed new terms on its customer, Production Steel. For the first time, Sumitomo required Production Steel to secure the purchase price with a letter of credit. A substantial down payment, not theretofore required, was demanded and received before Sumitomo would place the steel for fabrication. The terms in each of three previous transactions between these parties called for payment 30 days after delivery and Production Steel was invoiced accordingly. In contrast, in this transaction demand for the balance of the contract price was made before due under the contract and demand was accompanied by a threat to call upon the letter of credit. Finally, a post-dated check was issued and accepted.

These variations from the usual course of dealings are significant and revealing. All of the changes resulted in further security and safety for Sumitomo. All were required or encouraged by Sumitomo and none can be said to have benefited Production Steel. All the demanded changes are consistent with the view that Sumitomo knew of the debtor's financial problems and wanted more favorable terms than in the past. Congress intended § 547(c)(2) to prevent the avoidance of transfers which because of their ordinary character, were not deemed injurious to either the debtor's rights or those of other creditors. H.R. Rep. 95–545, *supra* at 373 U.S. Code Cong. & Admin. News 1978 p. 6329. The exercise of leverage by Sumitomo in the ways indicated takes this transaction out of the class of ordinary course transactions intended to be protected by § 547(c)(2).

Sumitomo has also failed to prove the objective element of its § 547(c)(2) defense. The requirement that the transfer be made "according to ordinary business terms" must be considered in the context of the business in which the parties are engaged. Terms which may be ordinary in the course of a steel import/export transaction may not be ordinary in other business transactions.

the financial condition of the debtor at the time the transfer was made. The presumption of insolvency and the lack of a requirement of knowledge in the transferee render § 547 a much broader avoidance power than its predecessor. *See* 2 W. NORTON, NORTON BANKR.L. & PRAC. § 32.14 (1981).

Sumitomo provided no objective evidence or analysis of what "ordinary business terms" are in this industry.[7] The only evidence of what may constitute ordinary business terms within the steel import/export industry is the record of the prior transactions between Sumitomo and Production Steel. As demonstrated above, it is clear that the transaction at bar did not take place on those terms. It is not enough simply to argue that down payments, letters of credit, premature requests for payment and payment by postdated check are each, individually, ordinary business practices. It must be established by competent evidence that these factors, when taken together, constitute a transaction made according to ordinary business terms. Sumitomo has completely failed to carry its burden of proof under § 547(c)(2)(D).

For the foregoing reasons, this court finds that the payment made by Production Steel to Sumitomo does not fall within the § 547(c)(2) exception to § 547(b). Accordingly, Production Steel is entitled to partial summary judgment on its cross motion.

An appropriate order will be entered.

7. Neither, for that matter, has Sumitomo demonstrated what the relevant "industry" is for

purposes of this analysis.