## WINDSOR COMMUNICATIONS GROUP

v.

## FREEDOM GREETING CARD CO., INC.

Civ. A. No. 86–2641.
Bankruptcy No. 82–03714K.
Adv. No. 84–0578K.

United States District Court,
E.D. Pennsylvania.

July 17, 1986.

Douglas J. Smillie, Phila., Pa., for plaintiffs.

David Weinstein, Phila., Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Appellant Freedom Greeting Card Company, Inc. has appealed, pursuant to 28 U.S.C. § 158(a), from an order of the United States Bankruptcy Court for the Eastern District of Pennsylvania entering judgment for appellee Windsor Communications Group, Inc. in the amount of $8,406.04. The bankruptcy court disallowed a transfer of property from Windsor to Freedom, holding it to be a preferential transfer in violation of the Bankruptcy Code, 11 U.S. C.A. § 547(b) (West 1979). The questions before me are whether the return of some greeting cards in accordance with a consignment sale agreement constituted a preferential transfer under section 547(b), and if so, whether it was authorized by one of the three exceptions listed in section 547(c). Because I find that the transfer falls within one of these exceptions, I will reverse the judgment of the bankruptcy court.

## I. FACTS

Freedom, a supplier of greeting cards, and Windsor, a small retailer, did business from 1971 until 1982, when Windsor became bankrupt. Throughout that time, Freedom provided Windsor with greeting cards on a consignment basis. Although the details of the sales agreements varied during the years, all of them contained an "option to return" clause. If Windsor did not sell an entire Freedom shipment within a specified time, then Windsor had the option of paying for the full shipment or returning the unsold portion for a credit.

In June 1981, Windsor submitted a purchase order to Freedom for greeting cards. Freedom then issued a "pro forma invoice" in the amount of $18,796.60, representing the purchase price of Windsor's order. In three separate shipments during March and April of 1982, Freedom sent Windsor cards with a total invoice value of $15,734.84. In addition to these shipments, Windsor owed Freedom $360.49 from an earlier order. This previous balance combined with the value of the three shipments created a total accounts receivable balance of $16,095.33.

This order and the shipments resembled the previous dealings between the parties in virtually all ways. The sales agreement had an "option to return" clause, and payment was not due immediately. In one minor respect, however, the parties departed from past practice. Freedom had expressed some concern about Windsor's financial stability. As a result, Windsor sent Freedom a promissory note payable on May 7, 1982 to ensure payment of this order. This note, sent before the merchandise was shipped, was later replaced by a note issued on May 7, 1982 and made payable on July 20, 1982.[1] Both notes were for the exact amount of the pro forma invoice ($18,796.60).

On May 27, 1982, Windsor returned to Freedom a portion of the cards pursuant to their consignment sale agreement, which included a right to return until June 15, 1982. On June 7, 1982, Freedom accepted the cards. It then issued a credit to Windsor for $7,041.28—the invoice value of the returned cards. Freedom never collected payment for those cards which were not returned, even though payment was due in July 1982. Currently, its records reflect an

---

1. On page 768 of 63 B.R. on the bankruptcy court opinion, it incorrectly states that the replacement note was payable on June 10, 1982 instead of July 20, 1982. *See* Plaintiff's Exhibit No. 4.

outstanding accounts receivable of $9,054.05 due from Windsor.

On August 5, 1982, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against Windsor. Soon afterward, the Chapter 7 liquidation was converted to a reorganization proceeding under Chapter 11. Windsor, as a Chapter 11 debtor-in-possession, initiated an adversary proceeding against Freedom on May 9, 1984.[2] The complaint sought to recover the value of an alleged preferential transfer. The case was tried by the bankruptcy court on June 4, 1985. On March 17, 1986, 63 B.R. 767, the bankruptcy judge issued an opinion and order, finding that Windsor was entitled to recover some $8,400.00—the value of the returned cards plus interest. The case is now before me on appeal from the bankruptcy court's ruling.

## II. CONCLUSIONS OF THE BANKRUPTCY COURT

The findings of fact made by the bankruptcy court are not disputed by either party.[3] But the legal significance of those facts is contested. The bankruptcy court held that the return of the cards to Freedom constituted a preferential transfer because it met the requisite elements set

**2.** The Code grants a debtor-in-possession under Chapter 11 all of the rights and powers of an appointed trustee. 11 U.S.C.A. § 1107(a).

**3.** The facts listed above include those set forth in the bankruptcy court opinion as well as additional information gleaned from the record. Because the bankruptcy judge did not analyze the transfer under § 547(c), he made no findings as to the "ordinary course of business" defense. Accordingly, as I am empowered to, I have supplied that information where necessary and where it was readily available in the record. *See Betancourt v. Garcia,* 49 B.R. 620, 622 (Bankr.D.P.R.1985) ("appellate courts [i.e., district courts] need not remand and may make additional findings themselves when the evidence before it is documentary or if all the facts relied upon to support the particular judgment are in the record ... and are undisputed").

**4.** That subsection states:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
 (1) to or for the benefit of a creditor;

forth in section 547(b) of the Code.[4] At trial, the principal point of contention was whether the returned cards belonged to Windsor—that is whether they were "property of the debtor" within the meaning of section 547(b)—in light of the consignment sale agreement. In his opinion, the bankruptcy judge found that Windsor did have an interest in the cards at the time it returned them. He, thus, ruled that Freedom had received a preferential transfer in violation of section 547(b).

## III. DISCUSSION

On appeal, Freedom raises a number of issues, including the one mentioned above. I do not reach most of those questions, however, because I hold that section 547(c) rather than section 547(b) governs this action. Section 547(c), which was not considered in the bankruptcy court opinion, lists exceptions to the preferential transfer rule. In part, it states:

(c) The trustee may not avoid under this section a transfer—

 &middot; &middot; &middot; &middot; &middot;

 (2) to the extent that such transfer was—

 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made—
 (A) on or within 90 days before the date of the filing of the petition; or
 (B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—
 (i) was an insider; and
 (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and
 (5) that enables such creditor to receive more than such creditor would receive if—
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provision of this title.
11 U.S.C.A. § 547(b). The 1984 amendments to this section are not applicable here, because their effective date is after the filing of this complaint. *See* 11 U.S.C.A. § 547 (West.Supp. 1986).

 (A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

 (B) made not later than 45 days after such debt was incurred;

 (C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

 (D) made according to ordinary business terms.

11 U.S.C.A. § 574(c)(2).[5] As analyzed below, I find that the transaction here satisfies the four requirements of this subsection, and hence is not voidable.

### A. *Payment of Debt*

■ My initial inquiry is whether the return of the cards was "in payment of a debt incurred in the ordinary course of business."[6] *Id.* § 547(c)(2)(A). In making this determination, I must first focus on the past relationship of the parties: "If there is an ongoing creditor-debtor relationship, it would appear that the intent of Congress would be to exempt the payments to the secured creditor if, as here, [the transfer], although made shortly before bankruptcy, was the result of a preceding commercial relationship." *In re Graves*, 45 B.R. 858, 865 (E.D.Cal.1985) (approving exemption under § 547(c)). Freedom established at trial that it and Windsor had been doing business for many years, and that all their dealings had included an "option to return" agreement. The transfer, made pursuant to an ongoing business relationship, was thus payment of an ordinary debt and, as such, falls within the first prong of the exception.

### B. *45–Day Rule*[7]

■ The second point to consider is whether the transfer, made on June 7th (the date of receipt by Freedom), occurred

"not later than 45 days after [the] debt was incurred." § 547(c)(2)(B). Although "in a credit transaction the debt becomes legally binding as soon as the credit is extended, conversely, with an option contract the debt is not legally binding on the debtor until he exercises his option to buy the goods subject to the option contract." *In re Economy Milling Co.*, 37 B.R. 914, 921 (D.S.C.1983). In this case, Windsor incurred its debt on May 27th, when it exercised the option to return a portion of the shipment. The transfer on June 7th, therefore, fell well within the 45–day limit.

### C. *Course of Business*

■ The third requirement of this section is that the transfer be "made in the ordinary course of business" between the parties. § 547(c)(2)(C). "To be subjectively 'ordinary' as between the parties implies some consistency with other business transactions" between them. *In re Production Steel, Inc.*, 54 B.R. 417, 423 (Bankr.M.D.Tenn.1985). This consistency is required because section 547 prohibits a creditor from doing anything abnormal to gain an advantage over other creditors. *See* § 547(c) note ("The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy."). Thus, I must consider whether the return of the cards was an attempt to escape the preferential transfer proscription of section 547(b). If so, it would be improper to exempt it from the bankrupt estate.

■ In light of the purpose of section 547, Freedom must show only that this transaction was "ordinary," not that it oc-

---

**5.** Again, the 1984 amendments to this section are inapplicable.

**6.** For the purpose of this exception, it makes no difference whether the "payment" was made in cash or through the return of goods. *In re American Gypsum Co.*, 36 B.R. 360, 362 (Bankr. D.N.M.1984).

**7.** This discussion of the 45–day rule will soon become a moot point, for the 1984 amendments to the Code removed this requirement. *See* § 547(c)(2) (West Supp.1986).

curred often or even regularly: "The transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally." *Economy Milling*, 37 B.R. at 922. Freedom has met this part of the test. By returning the greeting cards, Windsor merely exercised a contractual right that existed in all its prior agreements with Freedom. The option to return was not a device thought up to avoid the perils of bankruptcy, but a bargained-for element of the parties' customary business relationship.

Furthermore, I must scrutinize the transaction in order to determine if Freedom, wary of Windsor's impending insolvency, added any unusual terms to their business dealings. This final order differed from previous ones in only one minor respect: the promissory note. But the existence of the note does not automatically render the transaction extraordinary. Rather, upon examination, I find that the note had no effect upon the parties' customary rights and duties.

First, the issuance of the note prior to the shipment of the cards did not in any way alter the pre-existing consignment sale agreement. Windsor still retained the right to return any unsold cards for a credit against its outstanding balance due. Second, the note was not payable until July 20, 1982—the same time at which Windsor was already obligated to provide payment for the order. Third, the note did not provide any actual security for Freedom, in contrast to, for instance, a down payment or a C.O.D. delivery. *Cf. Production Steel*, 54 B.R. at 423 (new requirements of substantial down payment and early payment preclude protection of § 547(c)). The best evidence of the ineffectiveness of the note is, of course, Windsor's failure to pay a cent on it.

There was some question at trial as to who initiated the idea of the note, but it appears to have been offered as little more

than an expression of good faith.[8] It did nothing to alter the parties' long-standing business relationship, thus preserving the ordinariness of the transaction.

D. *Business Terms*

The final question is whether the transfer was "made according to ordinary business terms." § 547(c)(2)(D). In large part, this analysis is an objective one, hinging on what practices are common in the greeting card industry. *Id.* Undisputed evidence was produced at trial that consignment sales are standard in the greeting card industry, due in part to the cyclical nature of the business. Consequently, there was nothing objectively extraordinary about this transaction.

## IV. CONCLUSION

Because the transfer of cards from Windsor to Freedom fits within the exception of section 547(c), it may not be overturned as a preferential transfer under section 547(b). Accordingly, the judgment of the bankruptcy court is reversed.

---

8. A key sign of the parties' lack of seriousness about the note is the fact that it incorrectly listed an amount $2,000 more than was owed.