Thomas A. HICKEY, Trustee of
Alter–Hall Construction Co.,
Inc., Plaintiff–Appellee,

v.

NIGHTINGALE ROOFING, INC.,
Defendant–Appellant.

Civ. A. No. 87–1882–WD.

United States District Court,
D. Massachusetts.

Feb. 29, 1988.

Joseph G. Butler, Barron & Stadfeld,
Boston, Mass., for Thomas A. Hickey,
trustee.

Peter J. Gagne, Corwin & Corwin, Bos-
ton, Mass., for Nightingale Roofing.

MEMORANDUM

WOODLOCK, District Judge.

This case presents the narrow question
whether, and under what circumstances, a
trustee in bankruptcy may avoid as a pref-
erential transfer a payment made by a
debtor to a creditor in settlement of a law-
suit shortly before the debtor filed for
bankruptcy. The Bankruptcy Court below
found that such a transfer was not made in
the "ordinary course of business," *see gen-
erally*, 11 U.S.C. § 547(b) and (c), and, ac-
cordingly, that the creditor should be re-
quired to remit the proceeds of the transfer
to the trustee. *Alter–Hall Construction
Co., Inc. v. Nightingale Roofing, Inc.*, 73
B.R. 989 (Bankr.D.Mass.1987). The credi-
tor appeals.

I

Hickey, the trustee in bankruptcy
("Trustee") for Alter–Hall Construction
Co., Inc. ("Alter–Hall"), brought a claim
for $29,004.78 against Nightingale Roofing,
Inc. ("Nightingale") based on 11 U.S.C.
§ 547(b). Section 547(b) allows the trustee
to avoid preferential transfers made to
creditors by the debtor within ninety days
before the filing of a petition in bankrupt-
cy.

Alter–Hall, a general contractor, ar-
ranged on several occasions with Nightin-
gale, a subcontractor, for the latter to per-
form roofing jobs. On July 15, 1982,[1]
Nightingale contracted to roof the Serono
Lab for $50,000. The job was substantially
completed by December 1982, although the
balance remained unpaid.

On September 9, 1982, the parties agreed
that Nightingale would roof Hallston Plaza
in return for a payment of $26,800. By
December of 1982 Nightingale had sub-
stantially completed the Hallston project,
excepting some punch list items and the
tendering of a ten-year guarantee that was
required by the contract. An unpaid bal-
ance remained on this project as well.

On December 24, 1982, Nightingale filed
suit for payment of proceeds on the Hall-
ston project. Alter–Hall answered that the
non-payment resulted from Nightingale's
failure to perform. By February 23, 1983,
Nightingale finished all remaining work on

---

1. The date is apparently inaccurately stated as
"July 15, 1983," by the parties in their joint
stipulation of facts as well as by the Bankruptcy

Judge. *See* "Sub–Contract Agreement" exhibit 1
of "Stipulation of Facts."

both the Hallston and Serono projects. On March 4, 1983, Alter–Hall delivered a check to Nightingale for $29,004.78. This check represented $23,525 for Hallston, $3,800 for Serono [2] and $1,679.00 for several other projects. The parties thereupon exchanged releases for the Superior Court action and executed a stipulation of dismissal. Twenty-five days later Alter–Hall filed for bankruptcy.

## II

The parties agree that the power of a trustee to avoid preferential transfers is defined by § 547(b).[3] The parties dispute, however, whether the exception to § 547(b) that is found in § 547(c)(2) applies in this action.

Section 547(c)(2) prohibits a trustee from avoiding a transfer otherwise within subsection (b):

to the extent that such transfer was—
(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made not later than 45 days after such debt was incurred; [4]
(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(D) made according to ordinary business terms.

The parties are in agreement that debts remaining at issue here—totalling $24,825.78—concededly were *incurred* in the ordinary course of business and were made within forty-five days of incurring the debt.[5] The issue presented here is whether the *transfer* was made in the ordinary course of business and whether it was made according to ordinary business terms.

The Trustee argues that the transfer was not made in the ordinary course of business because:

Under these circumstances, it is reasonable to conclude that the payment was made by Alter–Hall in response to the filing of a suit by Nightingale and was thus, not a payment in the ordinary course of business.

The Bankruptcy Court agreed.

In his Memorandum, Judge Gabriel held that

[i]n view of the fact that ... payment was made on the same day that the parties agreed to dismiss the state court action and exchange releases, the Court is unable to conclude that that payment was made in the ordinary course and according to ordinary business terms.

*Alter–Hall,* 73 B.R. at 993.

## III

In support of the proposition that the instigation and settlement of the lawsuit was sufficient to render the transfer outside of the ordinary course of business, the Bankruptcy Court and the Trustee relied upon two cases. Neither, however, enunciates a proposition broad enough to bear the entire weight of the decision here.

*In re Craig Oil,* 785 F.2d 1563 (11th Cir.1986), involved a series of circumstances instigated by the creditor, Marathon Oil, (soon itself to be in bankruptcy) held suffi-

---

**2.** Part of the $3,800 was held in escrow pending delivery of the Serono guarantee (which was transferred on May 19). Before the Bankruptcy Court, the Trustee conceded that $2,500 of this sum was for the future delivery of the guarantee and has not pressed a claim for the monies allocated to secure delivery of the guarantee.

**3.** (1) The transfer was made fewer than ninety days before filing for bankruptcy, (2) Alter–Hall was insolvent at the time of transfer, and (3) Nightingale received more from the transfer than it would have under a Chapter 7 proceeding.

**4.** This section of the Bankruptcy Code was amended in 1984 by Pub.L. No. 98–353, which

eliminated the forty-five day requirement of subsection (c)(2)(B). The alteration does not affect the disposition of this case. For a discussion of the effect of the 1984 amendment *see* Gorney, *Elimination of the 45–Day Rule,* 91 Com.L.J. 364 (1986).

**5.** A portion of the March 4 payment was for debts incurred more than forty-five days before the bankruptcy filing. Nightingale did not contest that the Trustee may avoid this transfer, and has remitted the sum ($1,679) to the Trustee. As previously stated, *see* note 2 *supra,* the $2,500 payment made for the Serono guarantee is not now contested by the Trustee.

cient to show that its settlement with the debtor was outside of the ordinary course of business. Although the decision provides some support for the Trustee in this action, the court's concluding paragraph in *Craig Oil* shows dissimilarities in the fact patterns in the two cases.

> In view of all the circumstances surrounding the disputed payments, including the facts that [1] the debtor had not previously paid by cashier's check, that [2] a significant number of the payments were overdue, that [3] payments were made after Craig stopped buying from Marathon and [4] after its retail operation in Macon was closed, that continued payment was induced by the creditor's request for assurance of payment and that [5] another creditor was attempting to push the debtor into bankruptcy, we conclude that such payments were not made in the ordinary course of business. . . .

*Craig Oil*, 785 F.2d at 1568 (brackets inserted to identify separate fact circumstances).

None of these five circumstances occurred in the instant case. Circumstance [1] reflects merely a different type of problem, and its absence here signifies little. The remaining four, however, demonstrate genuine differences.

As opposed to circumstance [2] in *Craig Oil*, virtually no payments were overdue in this case. In *Craig Oil* a supply contract was the basis of the agreement, and the court had found that it would be unusual for a purchaser in financial straits to continue to pay a supplier from which it received no shipments.

Unlike *Craig Oil's* circumstance [3], we do not deal with installment payments made after the work was completed. The debt here was satisfied in one lump sum after the debt was incurred.

In contrast to circumstance [4] in *Craig Oil*, the instant case offers no evidence that Alter–Hall was closing facilities or terminating projects. Nor, for that matter, is there any evidence that Nightingale was even aware that Alter–Hall was in financial difficulty. No payments were demanded based on Alter–Hall's failure to perform contracts with third parties.

Finally, Nightingale, unlike Marathon Oil, was unaware that another creditor was attempting to push the debtor into bankruptcy. Thus circumstance [5] from *Craig Oil* is distinguished.

Nightingale's lack of knowledge regarding problems experienced by Alter–Hall takes this case outside the square holding of *Craig Oil*.

The second case cited both by the Trustee and the Bankruptcy Court as support for avoidance was *In re Daikin Miami Overseas, Inc.*, 65 B.R. 396 (S.D.Fla.1986). Although the facts in *Daikin* are not well developed, the court there approved a trustee's avoidance of a settlement agreement as a preferential transfer against the creditor's claim that the transfer was made in the ordinary course of business. Although the case superficially would seem to apply to the case at hand, nevertheless the decision of the court can be distinguished.

Upholding the bankruptcy judge's finding, in the penultimate paragraph of its decision, the district court stated that

> payments made pursuant to a settlement agreement, *which appear to be the result of an antecedent debt and prior dispute between the parties*, are simply not in the ordinary course of business.

*Id.* at 398 (emphasis supplied).

Of course one of the principal purposes of preferential transfer law is to allow the trustee to avoid unusual transfers made on debts incurred before the insolvency period. That was what was before the *Daikin* court. But that situation is different from the one here where no one disputes that the debt itself arose *during* the statutory insolvency period.

The law relied upon by the Trustee and the Bankruptcy Court then does not on closer analysis directly support the conclusions they have drawn. Under the approach advanced by the Trustee and accepted by the Bankruptcy Court, it is difficult to conceive of a settlement of litigation which could not be avoided as preferential.

That approach constitutes a virtual *per se* rule that otherwise acceptable litigation settlements are not part of "the ordinary course of business" within the meaning of § 547(c)(2)(C).

## IV

The proper treatment of litigation settlement transfers made during the insolvency period appears to present an appropriate candidate for *per se* treatment under § 547(c). As the First Circuit has observed:

> The trustee's power to avoid transfers [under § 547] is intended to discourage creditors from racing to the courthouse to dismember a failing debtor, thus enabling the debtor to solve its difficult financial situation.

*O'Neill v. Nestle Libbys P.R., Inc.*, 729 F.2d 35, 37 (1st Cir.1984). *See also In re Bullion Reserve of North America*, 836 F.2d 1214 (9th Cir.1988). Providing a window of opportunity—even the small one carved out by § 547(c)—for litigation settlements concluded on debts incurred and paid within the ninety day period before a bankruptcy petition is filed does little to discourage such a race to the courthouse.

The Bankruptcy Code itself does not define the meaning of "ordinary course of business" or "ordinary business terms." No case has been found dealing directly with the question whether use of litigation to insure the transfer of payments becoming due during the statutory insolvency period is outside of the ordinary course of business or otherwise not according to ordinary business terms.[6]

The legislative history offers somewhat different terms to suggest a definition of "ordinary."

> The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the

debtor or his creditors during the debtor's slide into bankruptcy.

S.Rep. No. 95–989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5874.

But the terms "normal financial relations" and "unusual action" are no more fully defined than "ordinary course of business" or "ordinary business terms." The most satisfactory definition is provided by a commentator who conducted an in-depth canvas of the legislative history and sources of the Bankruptcy Act. Broome, *Payments on Long–Term Debt*, 1987 Duke L.J. 78, 99. She concluded that

> it seems that section 547(c) obviously was intended to apply to 'transactions that take place within a fairly short period,' such as those incident to inventory purchases and utility payments.

*Id.* at 99.

In short, this exception was apparently designed to provide an exemption from preferential treatments for those short term obligations to cash creditors whose debts generally come due on something like a monthly basis. It was "payments made by a debtor to employees, suppliers, for utilities and rent, and other similar operating expenses or trade credit transactions [which] were intended by Congress to be exempt from recovery as preferences." *In re Bourgeois*, 58 B.R. 657, 659 (Bankr.W.D. La.1986). Litigation settlements are different not merely in degree but in kind from such transactions.

The First Circuit very recently issued an opinion that sheds further light on the issue. In a case construing § 547(c)(2) the court held that

> there appears to be something of a consensus among courts and commentators on the purpose of this section, which one commentator has described as the protection of 'recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the

---

**6.** *In re Magic Circle Energy Corp.*, 64 B.R. 269, 274 (Bankr.W.D.Okl.1986), a case also distinguishable from the one at hand, *allowed* creditor Hughes Tool Co. to retain installment payments made during the insolvency period *despite* the fact that Hughes, aware of the debtor's

mounting financial straits, renegotiated the terms of the debtor's indebtedness shortly before the insolvency period began. There is case law suggesting that transfers under these conditions are within the ordinary course.

debtor and the debtor's transferee.' 4 *Collier on Bankruptcy* ¶ 547.10, at 547–42 (L. King 15th ed. 1987). *WJM, Inc. v. Massachusetts Department of Public Welfare*, 840 F.2d 996, 1011 (1st Cir.1988).

*WJM*, of course, was not a case where the parties settled to avoid protracted litigation. Rather it presents an example of a non-consensual transfer being rejected as not within the scope of § 547(c)(2). The First Circuit affirmed the district court's ruling that a procedure used by the Massachusetts Department of Public Welfare for recouping overpayments to nursing homes was outside of the ordinary course of business. The Department of Public Welfare, failing to acquire the nursing homes' consent to a reimbursement for prior overpayments, had reduced by fifteen percent the state's monthly payments to the homes in order to make up the shortage. The court responded that "we have been shown no case, nor can we find one, where an *involuntary* transfer—such as the transfers here—was found to fall within this exception." *Id.* at 1011. Nevertheless, *WJM* demonstrates the careful scrutiny which should be applied to transactions which seek exemption from preferential treatment as "ordinary."

It is, of course, possible to provide a construction of litigation settlements which otherwise meet the conditions of § 547(c) as "ordinary." The conduct of litigation may be viewed as an ordinary correlative of business activity—particularly the construction business. And a rule might be tailored to protect settlements of such litigation from treatment as preferential transfers. It might be concluded that so long as the prompt resolution of such litigation does not otherwise run afoul of § 547, there should be no good reason why non-manipulative or non-collusive settlements of such litigation should be treated as preferential transfers. Under this view, the proper rule might be that when it is determined (1) the debt itself arose during the statutory insolvency period, (2) the litigation sought to recover only the debt then coming due, and (3) the creditor was unaware of the debtor's financial difficulties,

a settlement of such litigation should not constitute a preferential transfer. Thus, when a contract stipulates that payment is due upon performance, the bankruptcy laws would not be interpreted to burden prompt recourse to traditional legal remedies against a party in breach by a party who has performed. Indeed, denial of such recourse might itself be outside "the ordinary course of business."

But quite apart from the fact that it requires an extraordinarily latitudinarian reading of the term "ordinary"—quite at odds with the apparent intent of the § 547(c) exception—to treat litigation settlements as other than clearly not "ordinary," such a rule runs a foul a fundamental principle of Bankruptcy law.

A major goal of modern bankruptcy law has been the reduction of the number of litigable issues.

When Congress enacted general revisions of the bankruptcy laws in 1898 and 1938, it gave 'special attention to the subject of making (the bankruptcy laws) inexpensive in (their) administration.' Moreover, this Court has long recognized that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period,' and that provision for summary disposition, 'without regard to usual modes of trial attended by some necessary delay,' is one of the means chosen by Congress to effectuate that purpose.

*Katchen v. Landy*, 382 U.S. 323, 328–29, 86 S.Ct. 467, 472, 15 L.Ed.2d 391 (1966) (citations omitted). The 1978 revision of the bankruptcy laws removed the prior standard requiring avoidance of preferential transfers when the creditor received the transfer knowing of the debtor's slide into bankruptcy. "Its removal was justified on the ground that the difficulty in proving it sometimes allowed unworthy creditors to prevail or forced parties to devote too much time to an issue that did not implicate the policies underlying preference law." McCoid, *Bankruptcy, Preferences, and Ef-*

*ficiency: An Expression of Doubt,* 67 U.Va.L.Rev. 249, 258 (1981).

A reading of the term "ordinary" to permit litigation settlements proven after fact-finding to be of the type set forth in the possible non-*per se* rule discussed at p. 184 above would circumvent this purpose of the Bankruptcy law and invite disputes over the creditor's knowledge of the debtor's condition and other related fact intensive matters. The interest in economical and efficient resolution of bankruptcy matters would hardly be served by the opportunity to pursue such disputes.

It will be the very rare case in which a debt becomes due and a litigation settlement is effected during the ninety day period before a bankruptcy petition is filed. In such cases the likelihood is very high that the creditors' immediate recourse to litigation to obtain settlement reflects a dawning awareness that dismemberment of the debtor by creditors may shortly begin. Nothing in the limited purposes anticipated for the narrow exception provided by § 547(c) would appear to argue in favor of including litigation settlements within its purview. The prospect of fact-intensive disputes regarding the circumstances of litigation settlements and the degree of the creditor's knowledge before they were effected is not one to be welcomed in light of the larger purposes of modern Bankruptcy law.

Thus, it appears appropriate to enforce a *per se* rule that litigation settlements are not to be treated under any circumstances as transfers either "in the ordinary course of business" or "according to ordinary business terms."

Enforcing such a rule, I will affirm the Order of the Bankruptcy Court dated June 2, 1987, requiring Nightingale Roofing, Inc. to remit the sum of $24,825.78 to the Trustee.