**In re FIRST SOFTWARE
CORP., Debtor.**

**David J. FERRARI, Disbursing
Agent, Plaintiff,**

v.

**MICRO EDUCATION CORPORATION
OF AMERICA, Defendant.**

**Bankruptcy No. 86–10560–JNG.
Adv. No. 87–1113.**

United States Bankruptcy Court,
D. Massachusetts (Boston).

April 26, 1988.

Paul J. Ricotta, Hale and Dorr, Boston, Mass., for plaintiff.

Judy A. Rabkin, Levett, Rockwood & Sanders, Westport, Conn., for defendant.

MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

INTRODUCTION

Two matters are before the Court: the motion of Micro Education Corporation of America ("MECA") for summary judgment with respect to its ordinary course of business defense to First Software's preference complaint and First Software's cross motion for partial summary judgment with respect to the five elements that it must establish to entitle it to recover preferential transfers from MECA.

The Disbursing Agent for First Software commenced the instant adversary proceeding on May 20, 1987. He filed an amended complaint on August 28, 1987 through which he seeks $303,354.12 [1]. MECA filed a timely answer to the amended complaint in which it identified four special defenses. The only special defense of concern to the Court now is the ordinary course of business defense set forth on pages 2 and 3 of MECA's answer.

Following several months of discovery, the parties filed their respective motions for summary judgment. Both parties agree that the material facts necessary for

---

1. The amended complaint sets forth ten transfers of money and two product returns, totalling $328,291.70, and it gives MECA credit for transfers of new value in the form of goods valued at $24,936.78. There appears to be an eighty cent arithmetic error in either the amount of the judgment sought or in the amount of one of the transfers.

the Court to make findings relative to sections 547(b) and (c)(2) of the Bankruptcy Code are not in dispute.[2]

In its memorandum in support of its motion and in its memorandum in opposition to First Software's motion MECA does not mention, let alone challenge, First Software's position that the elements of section 547(b) have been established. Accordingly, the Court finds that MECA has waived the issue of insolvency raised in its answer.[3] Thus, without considering MECA's defenses to the preference complaint, the Court finds that First Software made transfers to MECA (1) to or for the benefit of MECA; (2) for or on account of antecedent debts; (3) while First Software was insolvent; (4) on or within 90 days before First Software filed its bankruptcy petition; and (5) that the transfers enabled MECA to receive more than it would have received had First Software not made the transfers. 11 U.S. C. § 547(b) (West 1987).

## FACTS

MECA and First Software commenced doing business in 1984. MECA granted extended credit terms to its customers, including First Software. MECA's payment terms to First Software called for payment within a specified time, usually 90 days from date of invoice. First Software, however, rarely made payments within invoice terms, a situation that apparently was typical with MECA's other customers as well.

MECA's principal product during the period in question was a software program called Managing Your Money. The program, unfortunately overlooked by First Software in its slide into bankruptcy,[4] was a software version of the popular finance book written by Andrew Tobias. Consumer demand for this product was highest,

according to the affidavit of MECA's Vice-President Frank B. Sbordone, Jr. ("Sbordone"), at the end of the year and in the first quarter of the year prior to April 15th. Accordingly, First Software anticipating increased demand and sales during that period, purchased over $900,000 of software on credit from MECA during the three months preceding December 31, 1985. In January of 1986 when the invoices relating to these purchases were over 90 days old, the parties reached an informal agreement providing for weekly payments against these invoices. Pursuant to this understanding, First Software made three payments in the approximate amount of $100,000 each in February 1986, instructing MECA to apply the payments against designated invoices.

In the spring and summer of 1985, MECA had reached a similar understanding with First Software. At that time according to Sbordone, First Software paid MECA $50,000 a week until outstanding invoices had been paid. Sbordone indicated in his affidavit that MECA made similar arrangements with other customers. The Court observes that the admitted payment history between the parties reveals payments of approximately $80,000 per week in early 1985 and in the summer of 1985.

Schedule A, attached hereto as Appendix 1, represents the admitted payment history between the parties. First Software and MECA interpret this payment history quite differently.

## DISCUSSION

■■■ With reference to Schedule A, First Software notes that payments to MECA were not normally made prior to 132 days after invoice date, yet the ten payments sued upon were made between 93 and 127 days after invoice date.[5] It also

2. The parties have not submitted an agreed statement of facts. However, both Counsel for the Disbursing Agent and Counsel for MECA stated on the record at the hearing on the cross motions for summary judgment that no material facts are in dispute. Accordingly, the Court has culled a statement of facts from pleadings submitted by the parties.

3. Additionally, the Court finds that MECA offered no evidence to rebut the statutory pre-

sumption of insolvency. *See* 11 U.S.C. 547(f) (West 1987).

4. In view of the fact that this is the third opinion spawned by First Software's numerous preference complaints, the Court permits itself a bit of humor at the Debtor's expense.

5. Neither party was able to establish the actual dates when MECA received First Software's

emphasizes what Sbordone said in deposition testimony, namely that, in the ordinary course of business between First Software and MECA, First Software paid between 120 and 180 days after invoice date. First Software's analysis is based only upon invoices dated in 1985, not payments made in 1985 toward invoices dated in 1984 and 1985, and does not include a "highly unusual payment" made 72 days after invoice date. First Software also maintains that it was not in the ordinary course of business of First Software and MECA to enter into special, accelerated repayment schedules, citing, *In re Jet Florida System, Inc.*, 73 B.R. 552 (Bankr.S.D.Fla.1987); *In re Frigitemp Corp.*, 34 B.R. 1000 (D.S.D.N.Y. 1983), *aff'd*, 753 F.2d 230 (2nd Cir.1985); and *In re Auto-Train Corp.*, 55 B.R. 69 (Bankr.D.C.1985).

MECA, in support of its motion, argues that other than tardiness there was nothing unusual about the ten payments in question—the payments were not lump sum and were only to be applied to one or more designated invoices. Moreover, MECA notes that 1) it did not refuse or threaten to refuse to ship First Software products; 2) it did not terminate or threaten to terminate business with First Software; and 3) it did not commence or threaten to commence litigation or involuntary bankruptcy proceedings.

Specifically, MECA observes that the timing of payments made in the period from January through March 1985 ranged from 85 to 125 days. Additionally, MECA suggests that an examination of payments made toward invoices dated in 1984 also is relevant. MECA concludes that First Software's well-defined range of payments ostensibly made in the ordinary course is a product of "wishful thinking." Moreover, according to MECA, the payments made in the first quarter of 1985 are most relevant since they correspond to the timing of the payments at issue here and relate to sales of Managing Your Money.

With respect to First Software's assertion that MECA's informal agreement with First Software was outside the ordinary course, MECA emphasizes that there was no dispute between it and First Software, and that the alleged preferential payments were neither accelerated nor large in view of the outstanding balance and payment history.

The positions of the parties raise two issues that the Court must decide: 1) whether the ten payments made between 93 and 127 days from invoice date were made in the ordinary course of business between MECA and First Software; and 2) whether the oral agreement to pay $100,000 per week was in the ordinary course of business between MECA and First Software.

Section 547(g) places the burden of proving the avoidability of a transfer on the trustee. It places the burden of proving the nonavoidability of a transfer upon the creditor or party in interest upon whom recovery or avoidance is sought. 11 U.S.C. § 547(g) (West 1987). Accordingly, First Software must establish that the five elements of section 547(b) have been met; and MECA must establish that the transfers in question were

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms

11 U.S.C. § 547(c)(2) (West 1987). Since MECA does not contest First Software's position with respect to section 547(b), the Court has found that First Software has met its burden of proof. However, the Court now finds that MECA has met its burden of proof with respect to the ordinary course of business defense.

In the Courts view, MECA's analysis of Exhibit A is more persuasive than that of

---

checks. In this Circuit, payment is made for purposes of section 547(c)(2) upon delivery of the checks. *O'Neill v. Nestle Libbys P.R., Inc.*,

729 F.2d 35, 38 (1st Cir.1984). In the absence of this information the Court and the parties have used the dates of the checks.

First Software. First Software advanced no compelling reason to totally ignore some payments made in 1985 and payments made in 1984. Additionally, the Court finds that the informal payment agreement was not tainted just because there only was one other similar understanding. *See In re Economy Milling Co., Inc.,* 37 B.R. 914, 922 (D.S.C.1983); *see also In re WJM, Inc.,* 65 B.R. 531, 542 (Bankr.D.Mass.1986), *aff'd* 840 F.2d 996 (1st Cir.1988).

Both the United States Court of Appeals for the First Circuit and the United States District Court for the District of Massachusetts have had occasion to consider section 547(c)(2) recently. In *WJM, Inc. v. Massachusetts Department of Public Welfare,* 840 F.2d 996 (1st Cir.1988), the court stated:

> [T]here appears to be something of a consensus among courts and commentators on the purpose of this section, which one commentator has described as the protection of 'recurring, customary credit transactions that are paid in the ordinary course of business of the debtor and the debtor's transferee.

*Id.* at 1011. *See also In re Magic Circle Energy Corp.,* 64 B.R. 269, 272–75 (Bankr. N.D.Okla.1986); 4 L. King *Collier on Bankruptcy* ¶ 547.10, at 547–42 (15th ed. 1987).

In *In re Alter-Hall Construction Co., Inc.,* 83 B.R. 180 (D.Mass.1988), the court emphasized that "careful scrutiny ... should be applied to transactions which seek exemption from preferential treatment as 'ordinary.' " *Id.* at 184. In *Alter-Hall,* the District Court, compared the circumstances present in a case frequently cited by this Court, namely *In re Craig Oil Co.,* 785 F.2d 1563 (11th Cir.1986), with the facts in the case before it. This Court will do likewise. In *Craig Oil,* the court summarized the circumstances surrounding disputed payments as follows:

> In view of all the circumstances surrounding the disputed payments, including the facts that [1] the debtor had not previously paid by cashier's check, that [2] a significant number of the payments were overdue, that [3] payments were

made after Craig stopped buying from Marathon and [4] after its retail operation in Macon was closed, that continued payment was induced by the creditor's request for assurance of payment and that [5] another creditor was attempting to push the debtor into bankruptcy, we conclude that such payments were not made in the ordinary course of business....

*In re Craig Oil Co.,* 785 F.2d at 1568 (brackets inserted to identify separate fact circumstances).

Some of the circumstances present in *Craig Oil* are present in the instant case. For example the ten payments in dispute were between 3 and 37 days overdue. In this regard, however, it must be kept in mind that First Software is complaining that the payments were too early to warrant ordinary course protection. Notably, the court in *Craig Oil* commented:

> Since the foundation of this provision is the similarity of trade credit and current expenses, the scope of its protection is necessarily limited to trade credit which is 'kept current' or other transactions which are paid in full within the initial billing cycle. Thus, untimely payments are more likely to be considered outside the ordinary course of business....

785 F.2d at 1567–68. In view of the purpose of section 547(c)(2), and MECA's more compelling analysis of Exhibit A, the Court is not swayed by First Software's argument that the ten payments in question were made too early to be within the ordinary course.

With respect to the parties' informal agreement, there was no accompanying cessation of business as in the *Craig Oil* case. The Sbordone affidavit also established that this type of an informal understanding was not unique in the relationship between MECA and First Software and in the relationships between MECA and its other customers. First Software's assertion that the informal agreement was not in the ordinary course was unsupported by affidavits or even allegations that would suggest that this arrangement was demanded by MECA, stemmed from a dispute between the parties, or was calculated to

give MECA an edge over other creditors. Significantly, Sbordone indicated in his affidavit that "MECA had no reason to believe that First Software was not capable of paying its debts, or that the company was on the verge of bankruptcy." So although other creditors may have been hounding First Software, *see In re First Software*, 84 B.R. 278 (Bankr.D.Mass.1988), MECA was unaware of this activity. From this analysis, the Court is convinced that First Software is advocating "a crabbed reading" of section 547(c)(2). The Court of Appeals for the First Circuit has disavowed such a reading of section 547(c)(2). In the *O'Neill* case, the court stated:

> The section 547(c)(1) and (2) exceptions further the goal of enabling debtors to rehabilitate themselves by insulating normal business transactions from the trustee's avoidance power. Without these exceptions creditors would be reluctant to conduct business with a struggling enterprise for fear that any payments made by the debtor could later be avoided. A crabbed reading of the section 547(c)(2) exception would only undermine this beneficial purpose.

*O'Neill v. Nestle Libbys P.R., Inc.* 729 F.2d at 37. Moreover, the Court finds that the parties' informal agreement was not extraordinary simply because there was only one other similar agreement. As the court in *In re Economy Milling Co., Inc.*, 37 B.R. 914 (D.S.C.1983), stated:

> [T]he requirement that the creditor show that the transaction was conducted in the ordinary course of business should usually be easy to meet. Since this showing is required merely to assure that neither the debtor nor the creditor do anything abnormal to gain an advantage over other creditors, an extensive showing that such transactions occurred often, or even regularly, is not necessary. The transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally.

*Id.* at 922.

First Software principally relies upon *In re Jet Florida Systems, Inc.*, 73 B.R. 552 (Bankr.S.D.Fla.1987) for the proposition that a special and unique payment arrangement is not within the ordinary course. In that case, the reorganized successor to the debtor sought to recover a preferential transfer made as part of a compromise process by which the debtor and American Airlines cleared their mutual debts through the Airlines Clearing House ("ACH"), an entity that acted as an agent for the airlines in reconciling and settling their debts. In May of 1984, Air Florida was expelled from the ACH because of successive defaults in transfers and payments to other airlines. After negotiating a loan, Air Florida cured its defaults and entered into a new, special agreement with ACH pursuant to which it was required to transfer its claims and pay its obligations two days earlier than normal. In view of the facts that payments were normally due on the 28th of the month, the court, emphasizing the special and unique agreement between ACH and the debtor, found that on a purely factual basis American had failed to carry its burden under section 547(c)(2).

The Court is not persuaded that this and the other cases cited by First Software are similar to the instant case. Clearly, expulsion from the ACH following defaults and reentry on stringent conditions signifies creditor pressure quite unlike the apparently amiable relationship between MECA and First Software.

First Software's position that the repayment arrangement is conceptually akin to a settlement agreement is untenable in the absence of any evidence of a dispute, let alone a litigation settlement. Therefore, the Court is unable to conclude that the per se rule of *In re Alter-Hall Construction Co., Inc.*, 83 B.R. 180 (D.Mass.1988), with respect to litigation settlements is applicable.

In view of the foregoing, the memoranda and arguments of counsel, the Court hereby enters judgment for MECA.

## APPENDIX I
## SCHEDULE A-1—ALL INVOICES

| Invoice Number | Invoice Date | Invoice Amount | Date of Check | Days Out* | Date Check Cleared | Days Out* |
|---|---|---|---|---|---|---|
| 1012 | 2/29/84 | 5,400.00 | 6/12/84 | 104 | | |
| 1037 | 3/21/84 | 5,400.00 | 5/14/84 | 54 | | |
| 1038 | 3/20/84 | 22,680.00 | 7/3/84 | 105 | | |
| 1059 | 4/19/84 | 9,180.00 | 6/29/84 | 71 | | |
| 1071 | 5/9/84 | 9,180.00 | 7/3/84 | 55 | | |
| 1085 | 5/29/84 | 22,680.00 | 7/18/84 | 50 | | |
| 1095 | 6/11/84 | 36,180.00 | 9/18/84 | 99 | | |
| 1105 | 6/21/84 | 22,032.00 | 10/2/84 | 103 | | |
| 2097 | 9/28/84 | 79,680.00 | 1/14/85 | 108 | | |
| 2102 | 10/10/84 | 480.00 | 2/12/85 | 125 | | |
| 2150 | 10/29/84 | 80,160.00 | 2/25/85 | 119 | | |
| 2182 | 11/16/84 | 80,160.00 | 2/20/85 | 96 | | |
| 2195 | 11/27/84 | 80,160.00 | 2/20/85 | 85 | | |
| 2218 | 12/7/84 | 80,160.00 | 3/7/85 | 90 | | |
| 2233 | 12/18/84 | 8,064.00 | 3/19/85 | 91 | | |
| 2246 | 12/21/84 | 10,560.00 | 3/27/85 | 96 | 8/13/85 | 235 |
| 2285 | 1/23/85 | 80,160.00 | 8/8/85 | 197 | 8/13/85 | 202 |
| | | | 8/14/85 | 203 | 8/20/85 | 209 |
| 2304 | 1/28/85 | 84,000.00 | 6/12/85 | 134 | 6/26/85 | 148 |
| 2313 | 1/31/85 | 80,160.00 | 6/12/85 | 132 | 6/26/85 | 146 |
| 2356 | 2/25/85 | 80,160.00 | 8/21/85 | 177 | 8/26/85 | 182 |
| 2395 | 3/12/85 | 80,139.96 | 8/29/85 | 170 | 9/3/85 | 175 |
| | | | 9/5/85 | 177 | 9/9/85 | 181 |
| 2414 | 3/29/85 | 80,160.00 | 9/5/85 | 160 | 9/9/85 | 164 |
| | | | 9/12/85 | 167 | 9/16/85 | 171 |
| 2500 | 5/23/85 | 939.71 | 2/12/86 | 265 | 2/19/86 | 272 |
| 2518 | 6/25/85 | 1,539.08 | 9/5/85 | 72 | 9/9/85 | 76 |
| 2519 | 6/25/85 | 1,539.08 | 9/5/85 | 72 | 9/9/85 | 76 |
| 2548 | 7/30/85 | 385.66 | 2/12/86 | 197 | 2/19/86 | 204 |
| 2576 | 8/21/85 | 121.57 | 2/12/86 | 175 | 2/19/86 | 182 |
| 2582 | 8/28/85 | 193.28 | 2/12/86 | 168 | 2/19/86 | 175 |
| 2585 | 8/29/85 | 313.74 | 2/12/86 | 167 | 2/19/86 | 174 |
| 2591 | 9/16/85 | 363.72 | 2/12/86 | 149 | 2/19/86 | 156 |
| 2598 | 9/18/85 | 434.48 | 2/12/86 | 147 | 2/19/86 | 154 |
| 2601 | 9/30/85 | 962.89 | 2/12/86 | 135 | 2/19/86 | 142 |
| 2610 | 10/8/85 | 20,154.96 | 2/12/86** | 127 | 2/19/86 | 134 |
| 2623 | 10/16/85 | 20,154.96 | 2/12/86** | 119 | 2/19/86 | 126 |
| 2625 | 10/16/85 | 2,403.03 | 2/12/86** | 119 | 2/19/86 | 126 |
| 2627 | 10/21/85 | 39,830.04 | 2/12/86** | 114 | 2/19/86 | 121 |
| 2635 | 10/21/85 | 242.23 | 2/12/86** | 114 | 2/19/86 | 121 |
| 2641 | 10/22/85 | 23,994.00 | 2/12/86** | 113 | 2/19/86 | 120 |
| 2650 | 10/30/85 | 95,976.00 | 2/19/86** | 112 | 2/28/86 | 121 |
| 2652 | 10/30/85 | 2,736.00 | 2/12/86** | 105 | 2/19/86 | 112 |
| 2656 | 11/1/85 | 19,995.00 | 2/19/86** | 110 | 2/28/86 | 119 |
| 2677 | 11/11/85 | 97,895.52 | 2/28/86** | 93 | 3/7/86 | 116 |

* Number of days from invoice date to payment date. Does not include day invoice was dated.
** Indicates payment alleged to be preferential.