**In the Matter of J.P. FYFE, INC. OF FLORIDA, Plaintiff,**

**v.**

**BRADCO SUPPLY CORPORATION, Defendant.**

**Civ. No. 88–4030(CSF).**

United States District Court,
D. New Jersey.

Nov. 30, 1988.

See also, Bkrtcy, 96 B.R. 479.

Budd Larner Gross Picillo, Rosenbaum Greenberg & Sade, P.C. by Suzanne M. Klar, Short Hills, N.J., for defendant.

Klehr, Harrison, Harvey, Branzburg, Ellers & Weir by Carol Ann Slocum, Cherry Hill, N.J., for plaintiff.

## OPINION

CLARKSON S. FISHER, District Judge.

This matter is before the court on the appeal of Bradco Supply Corporation ("Bradco") from a judgment entered against it by the United States Bankruptcy Court for the District of New Jersey. The essential facts are as follows. Bradco was engaged in the business of supplying roofing materials to J.P. Fyfe, Inc. of Florida and a related company, J.P. Fyfe, Inc. of New Jersey. (The "Fyfe companies"). Bradco had supplied the New Jersey company for ten years and had sold material to the Florida corporation for approximately three years.

By September of 1985, however, the Fyfe companies were delinquent in their payment of a $500,000 existing debt to Bradco. At that time Mr. John Delage, an officer of the Fyfe companies, met with Mr. Barry Segal, Bradco's president, and Mr. Donald Hollingworth, Bradco's financial manager. Mr. Delage sought a deferment of the Fyfe companies' $500,000 debt, and Bradco agreed to defer payments until October of 1985. Bradco further requested additional information concerning the Fyfe companies' financial condition.

In October of 1985 Mr. Delage informed Bradco that the Fyfe companies were unable to satisfy their $500,000 debt. By this time the Fyfe companies' bank had withdrawn its continued financing of Fyfe companies' jobs, and several jobs were in difficulty. In November, Mr. Delage conferred with Messrs. Segal and Hollingworth in order to obtain a payment schedule more favorable to the Fyfe companies' straitened financial conditions. Bradco informed Mr. Delage that it obviously could not continue to furnish supplies without payment. Mr. Delage informed Bradco that he could not continue operating without building supplies to complete his existing jobs and that his financial conditions were such that new sources of supply were unavailable.

As a result of these and other communications the parties agreed to defer indefinitely all indebtedness incurred by October 31, 1985. All payments received after November 1, 1985 were to be credited against the Fyfe companies' current orders of roofing supplies. On the basis of estimates supplied by the Fyfe companies, Bradco set a ceiling of 130 thousand dollars' worth of roofing supplies for both companies per month. Payments were to be made at the end of each month, beginning in January of 1986, sixty days from the November 1st date.

Under this arrangement the Fyfe companies made payments in January and February of 1986 totalling $230,000, of which $130,000 pertained to the February payment. Mr. Hollingworth credited this sum to the Fyfe companies' current debt. He failed to notify Bradco's accounting department of this credit, however, and that department credited the sums against the Fyfe companies' pre-November debt to Bradco. On March 31, 1986 the Fyfe companies failed to make a payment, causing Bradco to consider them in default and to stop shipping material to them. The Fyfe companies filed for bankruptcy on May 16, 1986.

On August 1, 1988, the bankruptcy court allowed J.P. Fyfe, Inc. of Florida's trustee in bankruptcy to avoid the $130,000 February payment to Bradco. Bradco appealed that judgment to this court on the ground that the court below erroneously excluded the $130,000 payment from the "ordinary course of business" exception provided by 11 U.S.C. section 547(c)(2).

Before the court can address the substantive arguments of the parties, it must first determine the applicable standard of review. The bankruptcy court's determinations of fact shall not be set aside unless they are "clearly erroneous," but its conclusions of law may be reviewed in a plenary fashion. *In re Morrissey*, 717 F.2d 100,

104 (3d Cir.1983); *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3d Cir.1981); Bankruptcy Rule 8013. Therefore, while the bankruptcy court's factual determinations will not be overturned without a showing of clear error, the court is free to determine whether or not the transfer evidenced by those facts is a voidable preference under section 547(c)(2). *See e.g., Windsor Communications Group, Inc. v. Freedom Greeting Card Co., Inc.*, 63 B.R. 770, 773 (E.D.Pa. 1986) (raising and deciding legal issues not contemplated by bankruptcy court on the strength of the record as developed).

■ The court notes, however, that a section 547(c)(2) determination is a "peculiarly factual one," *In re First Software Corp. (v. Curtis Mfg. Co.)*, 81 B.R. 211, 213 (D.Mass.1988), and that therefore the determination of the court below is to be accorded deference. *In re Fulghum Constr. Corp.*, 78 B.R. 146, 150 (M.D.Tenn. 1987). Further, the court notes that it should not give untrammeled access to section 547(c)(2), but should construe the statute narrowly. *See Id.* at 212–13; *Fulghum* 78 B.R. at 152; *accord, United States v. Rutherford*, 442 U.S. 544, 552, 99 S.Ct. 2470, 2475, 61 L.Ed.2d 68 (1979) (holding that well-defined statutes should be closely followed according to their terms).

■ Section 547(c)(2) states, in pertinent part, that:

(c) The trustee may not avoid under this section a transfer—

\*      \*      \*      \*      \*      \*

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. section 547(c)(2). Courts have consistently held that the statute requires the presence of each of the elements men-

tioned in subsection (c)(2)(A)–(C) before it will prohibit avoidance. *See e.g. Windsor Communications*, 63 B.R. at 773–75; *In re Seawinds Ltd.*, 91 B.R. 88, 90 (N.D.Cal. 1988); *In re First Software Corp. (v. Micro Educ. Corp.)*, 85 B.R. 669, 671 (D.Mass.1988); *In re Magic Circle Energy Corp.*, 64 B.R. 269, 272 (W.D.Okla.1986). Because it seeks to have the transfer declared unavoidable, Bradco has the burden of demonstrating the applicability of the exception. *First Software Corp. (v. Curtis)*, 81 B.R. at 212; *Magic Circle*, 64 B.R. at 272 n. 6; 11 U.S.C. section 547(g).

The parties do not dispute that appellee's February payment was made in satisfaction of a debt "incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. section 547(c)(2)(A). What is disputed is whether that payment satisfies subsections (c)(2)(B) and (C).

■ Subsection (c)(2)(B)'s phrase "in the ordinary course of business" is not defined by the Bankruptcy Code, and is left to judicial elucidation. The courts have considered this subsection to provide "a subjective test," which asks whether "the transfer [was] ordinary as between the debtor and the creditor?" *In re Production Steel, Inc.*, 54 B.R. 417, 422 (M.D. Tenn.1985); *Windsor Communications*, 63 B.R. at 774. The court must examine the February payment in terms of the "relation[ship] between the debtor and creditor as though that relation[ship] were in a vacuum." *Magic Circle*, 64 B.R. at 272. In making this determination, the court may consider the prior course of conduct between the Bradco and appellee, with particular regard to the circumstances surrounding the February payment. *See id.* at 274; *Production Steel*, 54 B.R. at 423; *Windsor Communications*, 63 B.R. at 773–74; *First Software Corp. (v. Micro Educ. Corp.)*, 85 B.R. at 672.

■ To be in "the ordinary course of business," the February payment need not possess a rigid similarity to each past transaction for materials between Bradco and appellee; Bradco need only "demonstrate *some consistency* with other busi-

ness transactions" between it and appellee. *Magic Circle,* 64 B.R. at 273 (emphasis supplied). Nor must the February payment be a matter of bland routine between the parties: "The transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally." *In re Economy Milling Co., Inc.,* 37 B.R. 914, 922 (D.S.C.1983).

However, the courts and other authorities require that the disputed transfer possess a sufficient degree of identity with preceding transactions that it could be compared to them without indicating a significantly adverse change in the debtor's liquidity. The general policy of subsection 547(c)(2) is:

> to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, (1977) *reprinted in* 1978 U.S.Code Cong. & Admin.News, 5963, 6329; S.Rep. No. 989, 95th Cong., 2d Sess. 88, (1978) *reprinted in* 1978 U.S.Code Cong. & Admin.News, 5787, 5874 (emphasis supplied). Thus, the subsection has been held to "encourage creditors *to continue* short term credit dealings with troubled debtors in order to forestall bankruptcy rather than encourage it." *In re Southern Commodity Corp.,* 78 B.R. 626, 628 (S.D.Fla.1987) (*quoting In re Morris,* 53 B.R. 190, 192 (D.Or.1985)) (emphasis supplied). As the First Circuit has stated:

> [T]here appears to be something of a consensus among courts and commentators on the purpose of this section, which one commentator has described as *the protection of 'recurring, customary credit transactions* that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee.'

*WJM, Inc. v. Massachusetts Dept. of Public Welfare,* 840 F.2d 996, 1011 (1st Cir. 1988) (*quoting 4 Collier on Bankruptcy,* para. 547.10, at 547–42 (L. King 15th Ed. 1987)) (emphasis supplied).

■ Hence, Bradco incorrectly asserts that the "ordinary course of business" criterion includes transfers made "to help [debtors] remain as ongoing entities." Brief of Appellant at 15–16. Section 547(c)(2) assumes a neutral position concerning whether a transfer is made to help a debtor or to hinder him. The section seeks to protect only the *continuation* of those types of transactions as would be entered into between the parties before the advent of financial difficulty in the hope that the debtor will somehow be able to pull himself out of his "slide into bankruptcy." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, (1977) *reprinted in* 1978 U.S. Code Cong. & Admin.News, 5963, 6329; S.Rep. No. 989, 95th Cong., 2d Sess. 88, (1978) *reprinted in* 1978 U.S.Code Cong. & Admin.News, 5787, 5874. If the disputed transfer was attended by extreme variations from the past course of dealing between the parties which make sense only in the context of a creditor's recognition that the debtor was in financial difficulty, then the transfer is avoidable.[1] *See e.g., Production Steel,* 54 B.R. at 422–23 (holding that "importantly different" transaction, which constituted a "variation[ ] from the usual course of dealings" avoidable); *Magic Circle,* 64 B.R. at 275 (holding that "unusual or extraordinary" circumstances may render transfer avoidable); *Windsor Communications,* 63 B.R. at 774 (stating that section 547(c)(2) "prohibits a creditor from doing anything abnormal to gain an advantage over other creditors"); *In re Craig Oil Co.,* 785 F.2d 1563, 1566 (11th Cir.1986) (holding normal payments avoidable preferences where such resulted from "unusual" collection methods).

---

1. It should also be observed that Bradco's position, if adopted, would encourage unusual transactions between creditors and debtors. The former would pour new sums into the coffers of the latter in the teeth of approaching bankruptcy in an attempt to recoup at least some of the previous losses. The court does not consider the policy of the Bankruptcy Code to encourage the formation of such voracious "money pits."

■ With these principles in mind, the court now turns to the bankruptcy court's decision. After specifically directing its attention to section 547(c)(2), that court expressly found that the arrangements between Bradco and appellee were "not in the ordinary course of business between the parties." Transcript, pp. 128, 142. The court below stated that these arrangements constituted a "new deal" between the parties, one which imposed terms and constraints not previously present between the parties, and which were imposed as a direct result of Bradco's knowledge of appellee's deteriorating financial condition. Transcript, pp. 131, 133, 141–42. The court below held that the evidence placed the February payment squarely outside section 547(c)(2). Transcript, pp. 108–09.

This court cannot take a different view. The uncontradicted evidence surrounding the February payment and its attendent circumstances can only lead to the conclusion that the disputed payment was not in the ordinary course of business between Bradco and appellee. Bradco, with detailed knowledge of appellee's deteriorating financial condition, agreed to defer appellee's half-million dollar debt and accept new payments for supplies which were subject to a Bradco-imposed monthly ceiling of $130,-000. This "new deal" was cut after Bradco was informed that the Fyfe companies had "temporarily" lost their bank financing, and after Bradco threatened to stop shipping supplies to appellee.[2] Both parties understood that as part of this arrangement, Bradco would cease supplying appellee upon default of any obligation owed by appellee. In the past, however, appellee had dealt with Bradco on the basis of an open account, an account which would not be closed as the sole result of outstanding indebtedness.

The court does not disagree with the bankruptcy court's impression that Bradco's actions were taken in a good-faith attempt to avoid "killing the golden goose" of appellee's business. Section 547(c)(2), however, does not grant rewards for such attempts—it only protects normal, customary business dealings. The February payment was not such a transaction; it was, rather, part and parcel of an extraordinary and unusual "master plan" by which Bradco exercised a hitherto-unknown degree of control over appellee's business activities.[3]

Consequently the court agrees with the court below, at least to the extent that Bradco failed to prove the "ordinary course of business" element of section 547(c)(2). Because this failure is as fatal to Bradco's appeal as it was to Bradco's case at trial, the court affirms the judgment of the bankruptcy court. An order has been entered. No costs.

■

---

2. Indeed, the record displays evidence that Bradco hammered out its "new deal" in conjunction with the efforts of a competitor. Mr. Hollingworth testified that Bradco informed appellee that it would accept the same or similar terms for future dealings as Allied Roofing Products, one of appellee's "major suppliers." Transcript pp. 30–35. There was no evidence that such criteria were within the past course of dealing between the parties.

3. These "control elements" of the Bradco–Fyfe arrangements prohibit the court from considering them an ordinary refinancing of existing indebtedness.

Similarly, it matters little whether Bradco credited the payments to appellee's existing or current indebtedness. These payments were made pursuant to an unusual transaction which constituted an avoidable preference under section 547(c)(2). Whether they were credited to past or existing debt is beyond the scope of a section 547(c)(2) inquiry when applied to the facts of this case. *Accord, In re Craig Oil Co.,* 785 F.2d 1563, 1566 (11th Cir.1986) (holding normal payments avoidable preferences where such resulted from "unusual" collection methods).