In re A.J. LANE & CO., INC., Lane Homes, Inc., Lane Management, Inc., Indian Hill Associates, Inc., Debtors.

Stanley MILLER, Trustee, Plaintiff,

v.

PERINI CORPORATION, Defendant.

Bankruptcy Nos. 89–40268–JFQ to 89–40270–JFQ and 89–40387–JFQ.
Adv. No. 92–4081.

United States Bankruptcy Court, D. Massachusetts.

Feb. 18, 1994.

David Madoff, Cohn, Roitman & Kelakos, Boston, MA, for Stanley Miller, Trustee.

James C. Gross, Klieman, Lyons, Schindler, Gross & Pabian, Boston, MA, for Perini Corp.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

This is a preference action. The principal issue raised is whether a pattern of late payments following dunning calls places the payments "in the ordinary course of business . . . of the debtor and the transferee," within the meaning of section 547(c)(2)(B) of the Bankruptcy Code. Stanley Miller (the "Trustee"), as trustee of the bankruptcy estate of A.J. Lane & Co., Inc. ("Lane, Inc."), brings the action against Perini Corporation ("Perini"). Except for the issue of insolvency, the parties agree the dispositive issues are questions of law rather than fact. Without the formality of motions for partial summary judgment, but intending the same consequences, they request the court to adjudicate the issues on the basis of an agreed statement of facts and certain documents filed by Perini in a state court action against the bank that financed the parties' construction project.

## I. FACTS

Lane, Inc. and its principal, Andrew J. Lane ("Lane"), are real estate developers and owners of rental properties used for commercial and residential purposes. Perini is a construction contractor with operations throughout the country.

On July 2, 1986, Perini and Lane, Inc. entered into a contract pursuant to which Perini agreed to construct for Lane, Inc. a four-story office building on land in Framingham, Massachusetts owned by Lane individually. The agreement provided for Perini to submit a requisition to Lane, Inc. each month setting forth the amounts owed to Perini for the preceding thirty days. Add, Inc. was the architect for Lane, Inc. Upon review and approval of each requisition by Add, Inc., Lane, Inc. was to pay Perini the amount set forth in the requisition. Add, Inc. was obligated to take "appropriate action" on a requisition within seven days of its receipt. Lane, Inc. was, in turn, obligated to make payments to Perini within fifteen days after it had received Add, Inc.'s recommendation. The agreement further granted Lane, Inc. the right to retain specified percentages of sums included in requisitions, exclusive of certain items.

Construction commenced in June of 1986 without Lane, Inc. having obtained outside funding of any sort. Lane, Inc. immediately fell behind in its payments to Perini. On July 1, 1986, Perini submitted Requisition No. 1 to Add, Inc. for its review and approv-

al. Perini received payment for Requisition No. 1 on August 1, 1986, thirty-one days after its submission. Payment for Requisition No. 2 was received twenty-nine days after its submission; payments for Requisitions No. 3 and No. 4 were received fifty-two and fifty-three days after submission, respectively.

On September 24, 1986, less than three months after commencement of work on the project, the Massachusetts Department of Environmental Quality and Engineering ("DEQE") ordered the immediate cessation of all work because of certain unauthorized changes made by Lane, Inc. in the project's design. Over the course of the ensuing twenty months, during which work on the project was suspended, the average length of time which elapsed between requisition and payment increased. The requisitions submitted by Perini during this period represented Perini's monthly administrative fees and the cost of work performed and materials purchased by Perini's subcontractors prior to the project's shutdown.

On October 15, 1986, Perini informed Lane, Inc. by certified mail of its concern regarding "the continuing problems we are experiencing in getting payments on this project." Requisition No. 5, submitted on October 31, 1986, was not paid until January 8, 1987, sixty-nine days after its submission. Requisition No. 6, submitted on February 20, 1987 for expenses incurred during November and December of 1986, was not paid until May 11, 1987, eighty days after its submission. Payments of Requisitions ·No. 7 through No. 15 were made, on average, some 180 days after their submission. No requisitions were submitted between February 8, 1988, and July 29, 1988.

On January 6, 1988, Lane, as the individual owner of the property, entered into a construction loan agreement with First American Bank for Savings (the "Bank"), pursuant to which the Bank agreed to lend Lane up to $7,000,000.00 to complete construction of the project. Lane executed and delivered to the Bank a promissory note in the principal amount of $7,000,000.00 and, as security therefor, a mortgage deed and security agreement granting the Bank a first mort-

gage on the property. Lane, Inc., the party to the contract with Perini, was not a party to the loan agreement. The loan agreement provided for the Bank to advance to Lane from time to time sums necessary to enable Lane, Inc. to pay Perini for its work. Section 1.6 of the loan agreement allowed the Bank, in its sole election, to make payments directly to Perini, or to Perini's subcontractors or suppliers, "from time to time and at any time with notice to Borrower and without prejudice to Borrower's right to contest the statement or requisition payment."

In June of 1988, Lane, Inc. resolved its dispute with DEQE. On June 14, 1988, it entered into a new agreement with Perini for completion of the project. The new agreement was written in the form of a change order to the prior agreement. It incorporated most of the prior terms, including the terms of payment. It also added a few provisions, and it made changes to the total price.

Work on the project continued through January of 1989. Lane, Inc. once again fell immediately behind in its payments. The first post-shutdown requisition—No. 17—was submitted on July 29, 1988 but not paid until September 19, 1988, fifty-two days later. On September 2, 1988, Perini wrote to Lane, Inc. that it was "quite concerned about the length of time it has taken for the first billing to be paid." Requisition No. 18 was paid thirty-two days after invoice; Requisition No. 19 forty-seven days after invoice; and Requisition No. 20 fifty-seven days after invoice. Requisition No. 21, in the amount of $532,-670.00, was submitted on November 30, 1988 but never paid. It constitutes part of Perini's proof of claim against Lane, Inc.'s estate.

On January 27, 1989, Lane, Inc. made the first of two payments which the Trustee alleges to be preferential. This payment, in the sum of $293,734, paid Requisition No. 22 in full, thirty-two days after the requisition's submission.

On February 8, 1989, Perini asked that the Bank, in accordance with the loan agreement, to pay Perini directly all amounts due and owing for its work. The Bank made no immediate response to Perini's request. As a result, on February 27, 1989 Perini ceased

work on the project. On March 2, 1989, representatives of Perini, Add, Inc., Lane, Inc. and the Bank met to discuss resumption of work by Perini. At that meeting, the Bank represented and assured Perini that it would pay Perini for any and all costs Perini would incur in connection with the project's completion, provided only that such costs were approved in accordance with the terms of the construction agreement. The parties' understanding was memorialized in a letter dated March 2, 1989. In that letter agreement, Perini promised to resume work when the Bank paid it the amounts owed on all requisitions to date and all retainages. Lane, Inc. agreed to pay Perini $53,399, which represented amounts earned, including retainages, under certain change orders. The parties also agreed that no further retainages would be withheld and that the Bank would pay Perini directly on all future requisitions. Lane, furthermore, was to grant Perini a second mortgage on the property under construction and other property.

On March 10, 1989, the Bank made payments totalling $737,984.00 on Requisitions No. 23 and No. 24R, which had been submitted by Perini in connection with work performed and materials supplied in January and February, 1989. One the same date, Lane, Inc. paid Perini $13,839.00, which represented a partial payment of the $53,399.00 which Lane, Inc. had agreed to pay under the letter agreement. This $13,839.00 payment is the second of the two transfers which the Trustee seeks to avoid.

On March 13, 1989, Perini resumed work on the project and continued to work until March 24, 1989, when Lane and Lane, Inc. both filed petitions in this court requesting orders for relief under chapter 11. On March 29, 1989, pursuant to the letter agreement, Perini submitted for Add, Inc.'s approval and the Bank's eventual payment Requisition No. 25 in the amount of $207,494. This was for work performed and materials provided during the period March 13 through March 24, 1989. Despite the Bank's promise that it would compensate Perini for its work, Perini never received payment for Requisition No. 25. Perini thereafter sued the Bank in state court for recovery of the $207,494. That suit is still pending.

## II. THE ORDINARY COURSE OF BUSINESS DEFENSE

Perini asserts that the January 27th payment of $293,734 and the March 10th payment of $13,839 are both protected as payments in the ordinary course of business under section 547(c)(2). That subsection states:

> (c) The trustee may not avoid under this section a transfer—
>
> . . . . .
>
> (2) to the extent that such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms;

Perini has the burden of proving the nonavoidability of a transfer under subsection (c)(2) and other subsections of section 547(c). 11 U.S.C. § 547(g) (1988). The requirement of paragraph (A) is obviously present. Paragraphs (B) and (C), however, are more problematic.

### A. Section 547(c)(2)(B)

The phrase "ordinary course of business ... of the debtor and the transferee" appearing in paragraph (B) is not defined. Legislative history gives some guidance, however. The House and Senate reports both state:

> The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy. H.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), S.Rep. No. 989, 95th Cong.2d Sess. 88 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News, 5787, 5874, 6329.

This comment was made when subsection (c)(2), as initially enacted, required that the transfer be "made not later than 45 days after such debt was incurred ..." P.L. 95–598, § 547(c)(2), 92 Stat. 2597 (1978). The subsection was amended in 1984. P.L. 98–353, § 547(c)(2), 98 Stat. 333 (1984). Although there is no legislative history on the amendment, it is generally assumed the amendment was prompted by general dissatisfaction with the lack of protection for payments made later than forty-five days which were commonly regarded as ordinary course payments. *See Morris v. Kansas Drywall Supply Co. (In re Classic Drywall, Inc.)* 121 B.R. 69, 74 (D.Kan.1990). The purpose of the defense, as articulated in the initial reports quoted above, therefore continues to be the same—"to leave undisturbed normal financial relations" not involving "unusual action by either the debtor or his creditors...." *See Marlow v. Federal Compress & Warehouse Co., Inc. (In re Jolian Co.,* 157 B.R. 834, 836 (Bankr.W.D.Tenn.1993).

■ Timely payments made in accordance with applicable payment terms are of course the quintessential examples of "normal financial relations" devoid of "unusual action" by either the debtor or the creditor. The courts nevertheless do not regard the lateness of a payment to be sufficient of itself to take the payment outside the scope of paragraph (B). A late payment is considered ordinary if it is within the pattern of payments between the parties. *E.g., Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.),* 957 F.2d 239, 244 (6th Cir.1992); *Yurika Foods Corp. v. United Parcel Service (In re Yurika Foods Corp.),* 888 F.2d 42, 44 (6th Cir.1989); *In re Xonics Imaging Inc.,* 837 F.2d 763, 766–67 (7th Cir.1988); *Morris v. Kansas Drywall Supply Co., Inc. (In re Classic Drywall, Inc.),* 121 B.R. 69, 73–74 (D.Kan.1990); *Ferrari v. Micro Education Corporation of America (In re First Software Corp.),* 85 B.R. 669, 671–72 (Bankr. D.Mass.1988). The Seventh Circuit has given perhaps the best explanation for treating continued late payments as payments in ordinary course under section 547(c)(2)(B):

Suppose a lease required the tenant to pay on the fifteenth of each month, without any grace period, but because the nature of the tenant's business or occupation inevitably made him short of cash in the middle of the month the landlord had over a substantial period of time accepted payment on the twentieth without charging interest or threatening to evict. Then one might well conclude that payment by the twentieth, though technically a violation of the lease, was within the ordinary course of business of the parties and should be within the protection of section 547(c)(2). It would hardly be a case within the policy of section 547(b), since it would not be a case where the tottering debtor had decided to put one creditor ahead of others; he would simply be doing the same thing he had done before he began to totter.... This case [the case before the court], however, is not one where the parties to a contract adopt an extra-contractual practice that becomes the ordinary course of business between them. *In re Xonics Imaging Inc.,* 837 F.2d at 766–67.

■ In other words, late payments are in the ordinary course of business of the debtor and creditor when the parties "adopt" them as their normal practice. Objections to the lateness by the creditor, dunning letters or threats to discontinue the parties' business relationship indicate the creditor does not adopt the practice. Relying upon the legislative history quoted above, most courts hold that such actions on the part of the creditor are the sort of "unusual" action that section 547(b) was designed to discourage and are thus outside the protection afforded by the section 547(c)(2). *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp. (In re J.P. Fyfe, Inc. of Florida),* 891 F.2d 66 (3rd Cir.1989) (payments not in ordinary course because made following notice of creditor's intention to file mechanics liens); *Xtra, Inc. v. Seawinds, Ltd. (In re Seawinds, Ltd.),* 888 F.2d 640 (9th Cir.1989) (lease payments not in ordinary course because preceded by demands for arrearage and termination of equipment leases); *Waldschmidt v. Ranier (In re Fulghum Construction Corp.),* 872 F.2d 739 (6th Cir.1989) (payments in ordinary course in absence of unusual debt collection practices); *Marathon Oil Co. v. Flatau (In re Craig Oil Co.),* 785 F.2d 1563 (11th Cir.1986) (payments

deemed not in ordinary course due in part to telephone call demanding immediate payment); *Florida Steel Corp. v. Stober (In re Industrial Steel Supply Corp.)*, 127 B.R. 62 (M.D.Fla.1991), *aff'd*, 961 F.2d 1582 (11th Cir.1992) (payments made in response to creditor's refusal to make further deliveries not in ordinary course); *Pioneer Technology, Inc. v. Eastwood (In re Pioneer Technology, Inc.)*, 107 B.R. 698 (9th Cir.BAP 1988) (stressing absence of unusual debt collection practices); *Hickey v. Nightingale Roofing, Inc.*, 83 B.R. 180 (D.Mass.1988) (payments pursuant to litigation settlement not in ordinary course); *Maloney–Crawford, Inc. v. HuntCo. Steel, Inc., (In re Maloney–Crawford, Inc.)*, 144 B.R. 531 (Bankr.N.D.Okla. 1992) (payments pursuant to work-out agreement and following dunning letters not in ordinary course); *Brown v. Heigel Lumber & Hardware (In re Mid–South Cabinet & Millwork, Inc.)*, 125 B.R. 16 (Bankr.E.D.Ark. 1990) (payments not in normal course when in response to threat not to extend further credit); *Miniscribe Corp. v. Keymarc, Inc. (In re Miniscribe Corp.)*, 123 B.R. 86 (Bankr. D.Colo.1991) (payments made in response to dunning calls not ordinary course); *Caplan v. Peterson Engineering Co. (In re Century Brass Products, Inc.)*, 121 B.R. 136 (Bankr. D.Conn.1990) (same); *Carlson v. Hughes (In re Aldridge)*, 94 B.R. 589 (Bankr.W.D.Mo. 1988) (stressing absence of dunning notices); *Richardson v. Philadelphia Housing Authority (In re Richardson)*, 94 B.R. 56 (Bankr.E.D.Pa.1988) (rents paid under threat of eviction not ordinary course); *Staats v. Branham Sign Co. (In re Circleville Distributing Co.)*, 84 B.R. 502 (Bankr.S.D.Ohio 1988) (payment in response to refusal to perform additional work not ordinary course); *Gull Air, Inc. v. Beech Acceptance Corp. (In re Gull Air, Inc.)*, 82 B.R. 1 (Bankr.D.Mass. 1988) (payments made under work-out agreement not ordinary course).

A few courts take a different view toward dunning calls or threats of termination of a business relationship. In *Lovett v. St. Johnsbury Trucking Co.*, 931 F.2d 494 (8th Cir. 1991), for example, the parties held meetings and the creditor made dunning calls because the debtor's payments were averaging 32 days beyond the 30 days permitted. The court considered the meetings and dunning calls to be normal collection procedure. It made no reference to the statute's legislative history. In so doing, for the reasons discussed, it failed to apply the statute's true meaning. *See also, Harrison III v. The Ink Spot (In re Rave Communications, Inc.)*, 128 B.R. 369 (Bankr.S.D.N.Y.1991) (payments after letter reminding debtor of thirty day credit terms considered ordinary course payment); *Levy v. Gatlin (In re Gardner Matthews Plantation Co.)*, 118 B.R. 384 (Bankr. D.S.C.1989) (payments made in response to threats to stop further shipments protected because part of pattern of parties' relationship).

Some courts refer to subparagraph (B) of the statute as its subjective component and to the requirement in paragraph (C) for "ordinary business terms" as its objective component. *See, e.g., Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.)*, 957 F.2d 239, 244 (6th Cir.1992); *Morris v. Kansas Drywall Supply Co., Inc. (In re Classic Drywall, Inc.)*, 121 B.R. 69, 75 (D.Kan.1990); *Inskeep v. Simone (In re Financial Partners, Ltd.)*, 94 B.R. 537, 539 (Bankr.N.D.Ill.1988). In so stating, these courts apparently mean only that subparagraph (B) requires an examination of what is ordinary between the parties. *E.g., Fred Hawes*, 957 F.2d at 244. As we have seen, the test under subparagraph (B) is objective in that it excludes a relationship involving payment demands by the creditor.

■ In the present case, the stipulation of facts discloses collection efforts only with respect to one of the two payments at issue— the $13,839 paid by Lane, Inc. on March 10th. Lane, Inc. made that payment after Perini had ceased work on the job on February 27th due to nonpayment. It did so as an inducement to get Perini back to work. The payment, moreover, was part of $53,399 of retainage which Lane, Inc. promised to pay under the letter agreement with Perini and the Bank of March 2nd. All aspects of that letter agreement were outside the parties' ordinary course of business—the work stoppage prompting it, the Bank's promise to make future payments directly to Perini and Lane, Inc.'s promise to pay retainage. Un-

der the parties' agreement of July 2, 1986, as modified on June 10, 1988, monies withheld as retainage were not to be paid until 60 days after final completion of the work.

■ Nor was the $293,734 payment of January 27th made in the ordinary course of business of Lane, Inc. and Perini. True, this payment was made as quickly as any payment during the postshutdown stage of the project, and it was only a few days later than the fastest payment in the preshutdown stage. By January 27, 1989, however, Perini was exerting great pressure upon Lane, Inc. due to nonpayment of Requisition No. 21 dated November 30, 1988 for $532,670. The state of affairs between the parties is disclosed in the memorandum filed by Perini in its state court action against the Bank. Perini there stated:

> Lane, Inc. failed to pay Requisition No. 21, dated November 28, 1988, for $532,670. Lane had received sufficient funds to cover Requisition No. 21, from the Bank. Notwithstanding the same and in spite of repeated demands by Perini of Lane, Inc. for payment of the amounts due, Lane, Inc. failed, refused and neglected to pay said Requisition No. 21, as well as subsequent Requisition No. 23, dated January 25, 1989, and Requisition No. 24, dated March 2, 1989.

Although these statements are not binding judicial admissions for the reasons set forth in Part III of this opinion, they are admissions which a fact finder may consider. Perini says the "repeated demands" referred to here related only to Requisition No. 21, as Requisition No. 22 had already been paid. To the contrary, it is clear from the quoted statement that Perini was making demands for payment of Requisition No. 21 before Lane, Inc. had paid Requisition No. 22. Payment of Requisition No. 22 in the context of repeated demands for payment of the prior requisition is not payment in the ordinary course.

It is also apparent that Requisition No. 22 was paid in response to demands for its own payment. Perini admits this. In attempting to blunt the significance of its demands for payment of Requisition No. 21, Perini states in its brief filed here that "Lane, Inc.'s habit-

ual lateness had forced Perini to make similar demands beginning with the very first Requisition, more than two years prior to the time of [the two transfers at issue]." Indeed, one could infer such demands from the stipulated facts.

In summary, Lane, Inc. paid Requisition No. 22 in response to Perini's demands for its payment and for payment of Requisition No. 21. As discussed, such demands take the payments out of the protection afforded to ordinary course payments.

The January 27th payment, moreover, constituted unusual action on the part of Lane, Inc. It was the only payment made while a prior requisition was still outstanding.

There is nothing inconsistent with the foregoing in the decision of a the bankruptcy court of this district in *Ferrari v. Micro Education Corporation of America (In re First Software Corp.)*, 85 B.R. 669 (Bankr. D.Mass.1988). In ruling that the payments there were made in ordinary course, the court was careful to note that the creditor made no threats to refuse to deliver product or to start legal proceedings.

**B. *Section 547(c)(2)(C)***

■ Section 547(c)(2)(C) requires that the payment in question be "made according to ordinary business terms." Use of the conjunctive "and" preceding this provision demonstrates it imposes an additional requirement, and the courts have so held. The standard is the normal practice in the parties' industry. *See, e.g., Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.)*, 957 F.2d 239 (6th Cir.1992); *Yurika Foods Corp. v. United Parcel Service (In re Yurika Foods Corp.)*, 888 F.2d 42 (6th Cir.1989); *WJM, Inc. v. Massachusetts Department of Public Welfare*, 840 F.2d 996 (1st Cir.1988); *Bell Flavors & Fragrances, Inc. v. Andrew (In re Loretto Winery, Ltd.)*, 107 B.R. 707 (9th Cir.BAP 1989); *Fiber–Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 150 B.R. 608 (E.D.Pa.1993). *Contra, Luce v. First Equipment Leasing Corp. (In re First Equipment Co. of America)*, 135 B.R. 169 (Bankr.S.D.Fla.1991) (denying presence of

industry standard because this would negate any benefit from the ordinary-course defense).

■ It is not sufficient for the creditor to establish that the payment in question was within the pattern of payments made to it by its other customers. The payment must fit into a pattern of payments which is standard within the entire industry. *E.g., Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.),* 957 F.2d 239 (6th Cir. 1992); *Yurika Foods Corp. v. United Parcel Service (In re Yurika Foods Corp.),* 888 F.2d 42 (6th Cir.1989).

■ Neither the January 27th nor the March 10th payment was made according to ordinary business terms. In attempting to sustain its burden of proof, Perini offers an affidavit of its vice president and controller, who states:

In some instances Perini does not receive payment for its work until after such payment is contractually due and owing. Such payments are often the result of the thorough and time-consuming examination to which Perini's work is subjected by the project's owner's architects, the project's lender's architects and state, federal and local regulatory authorities.... Such circumstances are common in the construction industry and constitute ordinary business practice.

This falls far short of establishing that the two payments at issue here were made according to ordinary business terms, when measured by what is ordinary in the construction industry. The affiant says nothing about late payments caused by financial problems and made in response to repeated demands. He speaks only of payments whose tardiness is due to the need for examination of the work by architects and regulatory authorities. Nor does the affiant say that even these payments happen more often than not. They happen only "[i]n some instances."

Common sense indicates that payments in the face of repeated demands are not "ordinary," even in the construction business. Moreover, this entire project, whether considered before or after the twenty month shutdown, was anything but ordinary. It is difficult to imagine one that is more filled with financial crisis. The construction industry can have its moments of crisis, but it is not as frenetic as what occurred here.

## III. WORK UNDER REQUISITION NO. 25 AS SUBSEQUENT NEW VALUE

A transfer to a creditor is not avoidable to the extent that

after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C. § 547(c)(4) (1988).

■ On March 29, 1989, Perini submitted for payment Requisition No. 25 in the sum of $207,494. This was for work performed and materials provided between March 13th and March 24th. Perini contends this is new value within the meaning of the statute.

The Trustee seeks to avoid application of the new value exception by contending that Perini performed the work for the benefit of the Bank and not Lane, Inc. The Trustee asserts that by March 13th it was an "economic reality" the Bank would "eventually" obtain possession of the property, so that the Bank and not Lane, Inc. benefitted from the work. That may be, but the work and materials were nevertheless furnished pursuant to the contract with Lane, Inc. and prior to foreclosure by the Bank. Lane, Inc. certainly derived the direct benefit.

■ Putting another string to its bow, the Trustee points to statements made by Perini in its state court litigation against the Bank. In its memorandum of law in that case, Perini said it "would be completing the project for the Bank and not Lane, Inc." Perini also asserted in its memorandum: "The Bank, as the holder of the first mortgage on the Property and the Project and now, by virtue of foreclosure, the owner of both, was and is the direct beneficiary of Perini's reliance on its promise." These and

similar statements, the Trustee argues, constitute judicial admissions establishing that Lane, Inc. derived no benefit from the work and materials furnished under Requisition No. 25. I disagree, for two reasons.

In the first place, there is no inconsistency between these statements and the fact that Lane, Inc. derived a benefit. Lane, Inc. benefitted from the payments in its capacity as the contracting party to whom the obligation to provide the work and materials was owed. The Bank also derived a benefit in that the work and materials enhanced the value of the property on which it had a mortgage.

■ In the second place, the statements are not binding judicial admissions. To constitute a judicial admission binding upon a party to an action, the party must make the statement either in the same action or in another action involving the same issues and parties. *Wang Laboratories, Inc. v. Applied Computer Services, Inc.*, 741 F.Supp. 992, 996 (D.Mass.1990), *reversed and remanded on other grounds*, 958 F.2d 355 (1992).

The value of the work and materials furnished under this requisition therefore reduces the Trustee's claim by $207,494.

## IV. THE EARMARKING DOCTRINE

Recall that Lane, individually, was the owner of the property and the borrower under the Bank's loan. Perini asserts that both payments in question, made by Lane, Inc. from its own checking account, came from loan proceeds disbursed to Lane, who in turn loaned them to Lane, Inc. so it could make the payments at issue. The payments, the argument runs, are therefore protected under the so-called "earmarking" doctrine. This requires a few words of explanation.

A preference does not take place unless the transaction involves a "transfer of an interest of the debtor in property." 11 U.S.C. § 547(b) (1988). Under the similar language contained in section 60 of the Bankruptcy Act of 1898, no transfer of the debtor's property was considered to occur when a third party paid the creditor directly. The only result of such a transaction is a substitution of creditors. *National Bank of Newport v. Nat'l Herkimer County Bank*, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912).

■ The earmarking doctrine is an extension of the *Nat'l Bank of Newport* decision. It applies when the third party making the loan transfers the funds to the debtor, who in turn pays the creditor. The factual question under the doctrine is whether the debtor had so little control over disposition of the funds that the payment should be treated as though made by the third party directly to the creditor. If the debtor had no control over the funds, no true transfer is considered to have taken place, only a substitution of creditors. *See, e.g., Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351 (5th Cir.1986); *Grubb v. General Contract Purchase Corp.*, 94 F.2d 70 (2d Cir.1938); *In re Henry C. Reusch & Co., Inc.*, 44 F.Supp. 677 (D.N.J.1942). One court has noted that the earmarking doctrine presents strong equities if the third party is a surety, because application of the doctrine avoids the risk of the surety having to pay twice, but that court questioned the doctrine's extension beyond the surety relationship. *McCuskey v. The Nat'l Bank of Waterloo (In re Bohlen Enter., Ltd.)*, 859 F.2d 561, 566 (8th Cir.1988).

■ There are three difficulties with application of the earmarking doctrine to the present facts. First, there is no showing that the payments in question represent proceeds of loans made by the Bank to Lane and then by Lane to Lane, Inc. Indeed, there are intimations that Lane, beset by financial problems, diverted portions of the loan proceeds for other purposes. In arguing another point, Perini says "the Bank believed that Andrew J. Lane had been diverting loan proceeds to purposes other than payment of Perini's Requisitions." Second, the element of restricted control is absent. There is no indication that any advances which Lane did make to Lane, Inc. were made on the express condition that the monies be used to pay Perini. Finally, there has been no substitution of creditors, which is a cornerstone of the earmarking doctrine. Lane has filed no claim in this bankruptcy proceeding against Lane, Inc. To the extent the Bank's loan proceeds found their way from Lane to Lane, Inc., Lane has apparently treated

them as capital contributions rather than loans.

## V. *THE PAYMENTS AS CONTEMPORANEOUS EXCHANGES*

 Perini's last argument borders upon the frivolous. It contends the payments of January 27th and March 10th qualify under the exception contained in section 547(c)(1). That subsection protects a transfer to the extent it was "intended" by the parties "to be a contemporaneous exchange for new value given to the debtor" and was "in fact a substantially contemporaneous exchange." The two payments come nowhere near qualifying under either of these requirements.

The existence of credit terms in the contract demonstrates the parties did not intend payment to be contemporaneous with performance of the work or submission of a requisition. And the delay in delivery of checks (thirty-two days or more) obviously prevents the payments from being "in fact substantially contemporaneous" with performance of the work. There is no support for a contrary conclusion concerning this second requirement in *Walsh v. Smythe Buick Isuzu (In re Gaildeen Industries, Inc.)*, 71 B.R. 759 (BAP 9th Cir.1987). The delay in payment the court dealt with in that case concerned delay in payment of a draft after the draft had been presented for payment. Legislative history indicates Congress considered a debtor's delivery of a check at or near the time consideration is furnished to the debtor to be a substantially contemporaneous payment so long as the drawee pays the check in the normal course. H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News, 5787.

## VI. *CONCLUSION*

If Lane, Inc. was insolvent at the time of the payments, the Trustee has a valid preference claim of $100,079, after giving Perini credit for the $207,494 of subsequent value represented by Requisition No. 25. A pretrial on the insolvency issue is set down for April 12, 1994 at 12:00 (noon).